No. 82-160

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

STATE OF MONTANA,

Plaintiff and Appellant,

vs.

DOUG GREENWALT and
ROY GREENWALT,

Defendants and Respondents.

---

Appeal from:  District Court of the Thirteenth Judicial District,
In and For the County of Big Horn
Honorable Nat Allen, Judge presiding.

Counsel of Record:

For Appellant:

Hon. Mike Greely, Attorney General, Helena, Montana
James M. Scheier, Intern, Office of Attorney General
argued, Helena, Montana
James Seykora, County Attorney, argued, Hardin, Montana

For Respondents:

Moses Law Firm, Billings, Montana
Michael Moses argued, Billings, Montana

---

Submitted:  March 24, 1983

Decided:  May 26, 1983

Filed:  May 26, 1983

_Clerk_

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Doug Greenwalt and Roy Greenwalt, defendants and respondents, were charged with the crime of theft, a felony. A jury trial was held on September 22-25, 1981, in the Thirteenth Judicial District Court, Big Horn County. On September 24, 1981, the District Court dismissed that part of the information involving the theft of a calf belonging to Nelvett Siemion, an enrolled member of the Crow Tribe. On September 25, 1981, the State, having presented all its evidence, rested, whereupon defendants moved to dismiss the remaining charges for insufficient evidence. The District Court granted defendants' motion, and the jury was dismissed. The State appeals.

We affirm the District Court's dismissal of the charge relating to the theft of the Siemion calf. We dismiss that portion of the appeal arising from the dismissal by the District Court of the remaining charges.

The following issues are dispositive:

1.) Whether double jeopardy prohibitions mandate the dismissal of the State's appeal.

2.) Whether the District Court erred in dismissing the charges relating to the theft of the Siemion calf.

On Sunday, November 9, 1980, at approximately 6:00 p.m., as John Siemion Jr., was working on his ranch in Big Horn County, he saw and heard a pickup truck and horse trailer traveling south on nearby Rotten Grass Road. The pickup's lights were on and John was able to see that it was light-colored and had wrap-around tail lights. Approximately five minutes later, John Siemion observed the same pickup and horse trailer traveling back up the same road, heading north.

2

The next morning, Monday, November 10, John Siemion was driving south on Rotten Grass Road. He came across two cows which were running back and forth along a fence in his pasture at Rotten Grass Creek. He noticed that the cows were bawling and that they had tight bags with their udders protruding, indicating that they were lactating. Their appearance and behavior indicated to John Siemion that the cows had been nursing calves and were trying to get out of the pasture to find their missing calves. The cows were branded with the Soap Creek Cattle Company (Soap Creek) brand belonging to P. R. Krone. John Siemion opened a gate and let the cows into an adjacent pasture which belonged to Soap Creek.

John Siemion drove further on the road and came across three more cows, whose appearance and behavior was similar to that of the first two cows. Two of these three cows bore Soap Creek's brand and the other bore a brand registered to his sister-in-law, Nelvett Siemion, an enrolled member of the Crow Tribe.

There were two spots on the road in which there was horse manure and cattle hoofprints. These appeared to be the spots where the cattle were unloaded from the horse trailer. John Siemion's mother notified Soap Creek, Nelvett Siemion, and and the sheriff's office.

That afternoon George Siemion, John Siemion's brother, went to see Doug Greenwalt to discuss the possibility of buying hay from him. While he was at the Greenwalts', George Siemion noticed a light-colored pickup with tires containing an unusual tread design, which was subsequently found to match the design of the tracks left on the road where the cows had been unloaded. He also noticed some weanling calves

3

in the Greenwalt corral. That evening George Siemion notified the Department of Livestock Inspector, Ron Reed.

On Tuesday morning, November 11, Inspector Reed met with two sheriff's deputies. They drove to Rotten Grass Creek to examine the area and to see the five cows, then drove to Doug Greenwalt's residence. Doug Greenwalt was driving a tractor when the men arrived. Inspector Reed informed Doug Greenwalt of the five cows that had been unloaded on Rotten Grass Road and mentioned that the tread of the tires on the Greenwalt truck matched those tracks found at Rotten Grass Creek. Inspector Reed asked several times whether he could bring the five cows over to Greenwalts' corral to see if any of the cows and calves would "mother-up" (the instinctive pairing between a cow and her calf would indicate their relationship). Doug Greenwalt motioned for Inspector Reed to join him in the cab of the tractor. He then told Reed that he and his father, Roy Greenwalt, had hauled the five cows up to Rotten Grass Creek and that they had intended to keep the calves, fatten them up, and sell them as payment for the ten or twelve years that Soap Creek cows had been grazing on Greenwalt pastures.

Doug Greenwalt removed four of the calves from the corral of about 250 weanling calves, but was unable to locate the fifth. Most Greenwalt calves had ear tags, while the four calves he found did not. The following day, Wednesday, November 12, the five cows were brought to the Greenwalts'. The four calves mothered up almost immediately; the fifth cow was placed in the weanlings' corral, where a calf mothered up within a few minutes. The cows and calves were removed from the Greenwalts' by Inspector Reed.

Doug Greenwalt and Roy Greenwalt were charged with theft of the five calves. During the presentation of the State's

4

case, the District Court granted defendants' motion to dismiss that part of the information charging the Greenwalts with the theft of the calf belonging to Nelvett Siemion, on the grounds that the State lacked authority to prosecute a non-Indian for a crime committed on the reservation against an Indian.

At the close of the State's case, the defendants moved for dismissal of the remaining charges on the grounds that there was insufficient evidence to establish that they had exerted "unauthorized control" over the calves. This argument was based upon section 81-4-217, MCA, which provides, in pertinent part:

> "Retention of trespassing stock. (1) If an animal breaks into an enclosure surrounded by a legal fence or is wrongfully on the premises of another, the owner or occupant of the enclosure or premises may take into his possession the trespassing animal and keep the animal until all damages, together with reasonable charges for keeping and feeding the animal, are paid. The person who takes the animal into his possession shall, within 72 hours after he takes possession, give written notice to the owner or person in charge of the animal, stating that he has taken the animal . . ."

Greenwalts were charged with the offense of theft, a felony as defined in section 45-6-301(1)(a), MCA, which provides, in applicable part:

> "A person commits the offense of theft when he purposely or knowingly obtains or exerts unauthorized control over property of the owner and:
> (a) has the purpose of depriving the owner of the property."

The District Court granted defendants' motion and dismissed the remaining charges, as allowed under section 46-16-403, MCA. The State appeals.

## I.

Defendants maintain that this Court's consideration of the State's appeal would violate their rights against double jeopardy under Article II, section 25 of the Montana

5

Constitution and under the Fifth Amendment of the United States Constitution. They argue that the appeal must be dismissed.

The right of the State to appeal in criminal cases is narrowly limited by section 46-20-103, MCA, which states in pertinent part:

> "(1) Except as otherwise specifically authorized, the state may not appeal in a criminal case.
> (2) The state may appeal from any court order or judgment the substantial effect of which results in:
>     (a) dismissing a case; (Emphasis supplied.)

It is true that in form, the District Court's action was a dismissal. But, where, after jeopardy attaches, the substantive effect of the court's action is acquittal, the State has no right of appeal. State v. Hagerud (1977), 174 Mont. 361, 570 P.2d 1131. As this Court noted in State v. Cool (1977), 174 Mont. 99, 101, 568 P.2d 567, 568:

> "The United States Supreme Court in United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 and Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629, emphasized that what constitutes an acquittal is not to be controlled by the form of the judge's action. Rather, this Court must determine whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged."

When a defendant has been acquitted at trial, he may not be retried on the same offense, even if the legal rulings underlying the acquittal were erroneous. Sanabria v. United States (1978), 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43; Fong Foo v. United States (1962), 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629. The judgment of acquittal not only bars further prosecution but bars appellate review of the alleged error by the trial court. Sanabria, supra; United States v. Martin Linen Supply Co. (1977), 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642. It does not matter whether the judgment of acquittal is based upon a jury verdict of not guilty or a

ruling by the court that the evidence is insufficient to convict; the judgment may not be appealed. United States v. Scott (1978), 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65.

In State v. Cool, supra, the trial judge granted defendant's motion for directed verdict of acquittal for insufficient evidence at the close of all evidence, and dismissed the case. The State appealed, and this Court granted defendant's motion to dismiss the appeal on double jeopardy grounds, relying on a statute (R.C.M. 1947 §95-2403) with provisions similar to those in 46-20-103, MCA. The Court stated:

> "Here the state contends the state of Montana has a statutory right to appeal under section 95-2403(b)(1). It argues the district court's ruling was in fact a dismissal. Defendant argues this was a motion for acquittal and such a motion does not constitute a dismissal of the case as contemplated in section 95-2403(b)(1).

> "We find no merit in the state's argument in relation to section 95-2403(b)(1), because subsection (b)(1) simply does not apply to the instant fact situation, no matter how the state tortures the language used by the district court. The court very clearly and with precision informed the state in reference to the evidence: 'I am just saying that it's insufficient.' There can be no question from the record before this Court that the district court's dismissal was an acquittal in substance as well as form." 174 Mont. at 101, 568 P.2d at 568.

In the case at bar, defendants' motion to dismiss for insufficient evidence was based on their assertion that because of the 72-hour notice rule in section 81-4-217, MCA, the State could not prove a necessary element of the crime-- unauthorized control--regardless of the other evidence it presented. The court replied:

> "Well it seems to me that it would be silly to let it go to the jury. I would just have to take the verdict away if they would find them guilty. I would have to set it aside. It would never stand up.

> "Well, let's go in and dismiss the jury."

7

The record contains no order of dismissal, nor does the transcript include the court's statements to the jury upon dismissing them.

We find the District Court's dismissal for insufficient evidence was, in substance, an acquittal, a resolution of certain factual elements of the offense charged, and, as such is not appealable.

Defendants argue that this conclusion also should be dispositive of the charges relating to the theft of the Siemion calf, since the circumstances surrounding the charges are identical. We do not agree. The Siemion theft charges had been dismissed on other grounds the day before the above charges were dismissed. We decline to extend the District Court's ruling to cover the Siemion theft.

II.

The District Court dismissed the charges arising from the alleged theft of the calf belonging to Nelvett Siemion on defendants' motion, ruling that the State lacked authority to prosecute non-Indians for crimes committed on the reservation against Indians. There is no dispute about the facts that Greenwalts are non-Indians, Nelvett Siemion is an enrolled member of the Crow tribe, and the alleged theft occurred on the Crow reservation.

We note that double jeopardy prohibitions are not applicable here, where the dismissal was based upon a jurisdictional question rather than a resolution of factual elements of the offense. Numerous United States Supreme Court decisions have distinguished between those dismissals based upon failure of proof, i.e., insufficient evidence, which are conclusive under the double jeopardy clause, and those dismissals unrelated to a defendant's guilt or innocence, which do not necessarily preclude appeal by the

8

state or further prosecution. Scott, supra; United States v. Dinitz (1976), 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267, (contains an excellent history and elaboration of the distinction); United States v. Sanford (1976), 429 U.S. 14, 97 S.Ct. 20, 50 L.Ed.2d 17.

The State makes a valiant argument in support of the State's assertion of concurrent jurisdiction with the federal government over crimes on the reservation committed by non-Indians against Indians. The State points out that tribal courts lack jurisdiction to prosecute non-Indians for crimes committed on the reservation; Oliphant v. Suquamish Indian Tribe (1978), 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, and that federal authorities decline to prosecute the great majority of those offenses. U.S. COMM'N ON CIVIL RIGHTS, INDIAN TRIBES--A CONTINUING QUEST FOR SURVIVAL 154-55 (1981). The State maintains that while the states are authorized to prosecute non-Indians for crimes against non-Indians on the reservation, see United States v. Antelope (1977), 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701, Indian citizens of the state have little protection against non-Indian criminals on the reservation under the existing circumstances. Finally, the State argues that, dicta aside, there are no specific holdings that the State lacks authority to assert concurrent jurisdiction.

We appreciate the State's arguments, but find that the great weight of authority supports the District Court's ruling.

In Williams v. United States (1946), 327 U.S. 711, 714, 66 S.Ct. 778, 780, 90 L.Ed 962, 964, the United States Supreme Court stated:

> "While the laws and courts of the State of Arizona may have jurisdiction over offenses committed on this reservation between persons who are not

Indians, the laws and courts of the United States, rather than those of Arizona, have jurisdiction over offenses committed there, as in this case, by one who is not an Indian against one who is an Indian."

The 1982 edition of FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, states at page 353, relying upon Williams:

"Criminal offenses by non-Indians against Indians or their property are subject to the Indian Country Crimes Act [18 U.S.C. §13]. The Supreme Court has stated that federal court jurisdiction under this Act is exclusive of state court jurisdiction."

See, AMERICAN INDIAN LAWYER TRAINING PROGRAM, INC., JUSTICE IN INDIAN COUNTRY (1980) 32, and MANUAL OF INDIAN CRIMINAL JURISDICTION (1978 Supp.) 73a; Getches, Rosenfelt and Wilkinson, FEDERAL INDIAN LAW (1979), 388 ("c. Crimes by a Non-Indian Against an Indian: State courts cannot have jurisdiction.")

This Court has addressed the matter in dicta in State v. Youpee (1936), 103 Mont. 86, 94, 61 P.2d 832, 835:

"We think the general rule well expressed in 21 Corpus Juris, Sections 128 and 130, pages 538 and 539, where it says: 'It is usually held that a state court has no jurisdiction over crimes committed by or against Indians within a reservation, such jurisdiction being in the United States or the tribal courts; but there are a few decisions, most of them early ones, to the contrary.'" (Emphasis in original.)

As noted above, the Oliphant decision in 1978 established that tribal authorities may not prosecute non-Indians.

In 1971, the United States Supreme Court discussed the steps necessary to establish state jurisdiction in civil and criminal matters. Kennerly v. District Court of Ninth J.D. of Montana (1971), 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507. The case arose in Montana, from the Blackfeet tribal council's attempt in 1967 to vest the State with concurrent jurisdiction over civil matters, absent the "affirmative legislative action" by the State as required before 1968 and

10

absent the tribal consent required--thereafter under 25 U.S.C. §1321-26. The Court stated:

> "Section 406 of the Act, 25 U.S.C. §1326 (1964 ed., Supp. V), then provides:
>
> "'State jurisdiction required pursuant to this subchapter with respect to criminal offenses or civil causes of action, or with respect to both, shall be applicable in Indian country only where the enrolled Indians within the affected area of such Indian country accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose. The Secretary of the Interior shall call such special election under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults.'
>
> "We think the meaning of these provisions is clear: the tribal consent that is prerequisite to the assumption of state jurisdiction under the provisions of Title IV of the [Civil Rights Act of 1968] must be manifested by majority vote of the enrolled Indians within the affected area of Indian country. Legislative action by the Tribal Council does not comport with the explicit requirements of the Act." 400 U.S. at 428-29, 91 S.Ct. at 483, 27 L.Ed.2d at 512.

See also State ex rel Flammond v. Flammond (1980) _____ Mont. _____, 621 P.2d 471, 37 St. Rep. 1991. (A civil action; contains a discussion of the requirement of State or tribal action before the State can assert jurisdiction.) No such tribal consent to the assumption of criminal jurisdiction by the State has been granted by the Crow tribe. It is not for this Court or the State to usurp the function of the tribe. We hold, therefore, that the District Court properly dismissed those charges arising from the alleged theft of the Siemion calf.

We affirm the District Court's dismissal of the charge relating to the theft of the Siemion calf. We dismiss that portion of the appeal arising from the dismissal by the District Court of the remaining charges.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

12

Mr. Justice John Conway Harrison dissenting.

My dissent is directed to the second issue and that is whether the District Court erred in dismissing charges relating to the theft of the Siemion calf. As previously noted in the opinion of the majority, Nelvett Siemion is an enrolled member of the Crow Tribe. Not only is she an enrolled member of the Crow Tribe, but she is a citizen of the State of Montana, and as a citizen of the State of Montana, she is entitled to all Constitutional rights other citizens enjoy. This Court, in the case of State ex rel. Kennerly v. District Court (1970), 154 Mont. 488, 466 P.2d 85, in a matter concerning civil jurisdiction, reviewed the problem of Indian rights and the effect federal and state jurisdictional problems have had upon our Indian citizens. While that case involves a civil matter, much of which was said therein, it is applicable here, even though the United States Supreme Court reversed our decision on a technical matter of approval of Indian ordinances by the Congress. Some of what we said in Kennerly is certainly applicable here and it is important that the Court consider the right of an Indian citizen in a criminal matter such as we have before us.

In Kennerly we noted that the jurisdiction problem arising from civil and criminal legal relationships between Indians and non-Indians, has been before this Court since statehood. With some 25,000 plus Indian citizens living on or near one of seven Indian Reservations in the state, it is understandable that the problem is not new; however, because of the duality of the Indian's legal status, each case must be considered in light of both state and federal relationships.

Indians, resident in Montana, whether they are full-blood or partial-blood, allotted or not allotted, domicile on the reservation or off of it, of one tribe or another, or whatever their status, are citizens of the State of Montana. They are entitled to the protection of our laws and are responsible to our laws. They are entitled to register to vote and many do. They are

13

entitled to hold public office, and some do. They vote in goodly numbers for office of judge of the District Court and for the justices of this Court. To now hold, as we do in the majority opinion, that an Indian citizen, who resides on a reservation, who has no protection from the federal law on that reservation concerning the stealing of one of his head of cattle, is not entitled to the protection of this Court, is, in my opinion, depriving one of our citizens the equal protection of the laws.

Article II, Section 16 of the 1972 Constitution provides:

> "The administration of justice. Court's of justice shall be open to every person, and speedy remedy afforded for every injury of person, property, or character. No person shall be deprived of his full legal redress for injury incurred for employment for which another person may be liable except as to fellow employees and his immediate employer who hired him if such immediate employer provides coverage under Workers' Compensation laws of this State. Right and justice shall be administered without sale, denial, or delay."

By holding as we do, we are disenfranchising an Indian citizen living within the external boundaries of an Indian reservation. We are closing our Courts to a large number of citizens of Indian heritage who live on a reservation. We are denying protection from the criminal element of the state who go upon reservations and deprive Indian citizens of their property. Long ago, in 1952, Justice Angstman, in opinion Bonnet v. Seekins (1952), 126 Mont. 24, 243 P.2d 317, held that the courts of this State are open to citizen's of Indian extraction. Today, we are denying one of those citizens a right to come to Court in a criminal matter.

Equal protection of the laws requires that all persons be treated alike under like circumstances. Billings Associated Plumbing, Heating & Cooling Contractors v. State Board of Plumbers (1979), Mont. ____, 602 P.2d 597, 36 St.Rep. 1996, Montana' Constitution offers greater protection to its citizen than the United States Federal Constitution and these protections should go to our Indian citizens as well as non-Indians.

14

I would find that there is jurisdiction in this matter with relation to a theft by a non-Indian of a calf of a Indian citizen and would remand the action to the District Court for trial.

_John Conway Harrison_
Justice

I concur in the foregoing dissent.

_V. C. Gulbrandson_
Justice