DA 10-0416

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 89

STATE OF MONTANA,

       Plaintiff and Appellant,

  v.

JOHN SHANNON FINLEY,

       Defendant and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
                  In and For the County of Lewis & Clark, Cause No. CDC 2010-23
                  Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Steve Bullock, Montana Attorney General; John Paulson,
              Assistant Attorney General, Helena, Montana

              Leo J. Gallagher, Lewis and Clark County Attorney, Mary Cochenour,
              Deputy County Attorney, Helena, Montana

       For Appellee:

              Joslyn Hunt, Chief Appellate Defender; Matthew Wilcox,
              Assistant Appellate Defender, Helena, Montana

Submitted on Briefs:  March 29, 2011

Decided:  April 26, 2011

Filed:

_____
                         Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     The State of Montana appeals an order of the District Court, First Judicial District, Lewis and Clark County, reversing John Finley's (Finley) conviction for partner or family member assault, entered in a Justice Court of record. We reverse and remand for further proceedings.

ISSUES

¶2     On appeal, the State raises the issue of whether the evidence presented to establish reasonable apprehension of bodily injury was sufficient to support Finley's conviction for partner or family member assault.

¶3     Finley raises the issue of whether the State's appeal is precluded by law.

BACKGROUND

¶4     At 1:41 a.m., on April 4, 2009, Debbie Finley made a 911 call to the Lewis and Clark County dispatch center. She placed the call from her cellular telephone after she fled her house by sneaking out of the back door. Breathless and audibly crying, Debbie told the dispatcher that her husband, Finley, had come home drunk and was trashing the place. She claimed that Finley blamed her for the recent arrest of their older son. She expressed fear for her ten-year-old son and mother, who were still asleep at the residence. The dispatcher asked if Finley had hurt anyone. Debbie responded, "He's trying to hurt me. . . . He's telling me he's going to crush my fucking head in, and stuff like that." She told the dispatcher that she was cold, because she had fled without shoes and was wearing

only a tee-shirt and pajama pants.

¶5 Initially, Debbie ran to a Montana Lil's Casino, down the street from her house. At one point during the 911 call, she became agitated when she thought she saw Finley walking towards the casino. The dispatcher convinced Debbie to proceed to the nearby Town Pump and wait for the police. Once there, Debbie informed the dispatcher that she had positioned herself away from the windows and refused to look outside. Ultimately, the dispatcher managed to coax Debbie to look outside and confirm that the police had arrived. During the eight-minute 911 call, Debbie repeatedly asked where the officers were and how soon they would reach her.

¶6 Reserve Officer Phil Richards, of the East Helena Police Department, was the first to arrive at the Town Pump. He encountered Debbie as she exited the building. She was shaking, hesitant to speak and exhibited redness around the eyes. Debbie informed Richards that she and her husband had a disagreement. Richards later testified that he was surprised that Debbie lacked shoes and was clad in only pajamas.

¶7 Next to arrive was Lewis and Clark County Sheriff's Deputy Eric Gilbertson. He testified that Debbie was emotionally upset, shaking and nervous. Gilbertson confirmed that Debbie was underdressed for the weather and estimated the temperature was between 20 and 30 degrees.

¶8 Third to arrive was Lewis and Clark County Sheriff's Deputy Matt Reighard. He too observed that Debbie was underdressed, nervous, afraid, and emotionally distressed. Debbie told Reighard that she probably would not be alive had she not left the house

3

when she did. She further expressed fear that Finley had pursued her after she fled. Additionally, she repeated the story she told to the 911 dispatcher and again expressed concern for her son and mother.

¶9 Reighard accompanied Debbie back to the residence. She remained in his patrol vehicle while he checked the house for Finley. During his sweep of the premises, Reighard visually confirmed that the damage was consistent with Debbie's story. After failing to locate Finley, Reighard returned to his vehicle. There, Debbie informed him she might have just seen Finley. Out of fear of remaining at her house, Debbie accompanied Reighard as he searched the neighborhood. The search proved unsuccessful.

¶10 Reighard and Debbie returned to her residence, where Debbie provided a written statement of the night's events. Reighard took photographs of the damaged closet, and the broken floor heater. He also photographed blood on the wall, which Debbie claimed was the result of Finley punching something. Additionally, Reighard found and photographed footprints in the fresh snow outside of the back door, heading towards the Town Pump. The footprints were too large to belong to Debbie and were made by someone wearing shoes. The deputy then left the residence and continued to search for Finley. Out of fear of remaining at home that night, Debbie called a friend to come get her, her son and her mother. Ultimately, the officers were unable to locate Finley, and the case was referred to the Lewis and Clark County Attorney's Office.

¶11 Finley was charged with partner or family member assault, second offense. A

4

bench trial was held on October 29, 2009. Debbie, Reighard, Gilbertson and Richards were all called as witnesses.

¶12    At trial, Debbie testified that many of her statements on April 4, 2009, were lies. She admitted calling 911, but claimed she fabricated the story so the police would remove Finley from her house. When asked why she would do this, Debbie responded that she disliked when Finley was drunk, because her father had been an alcoholic. She acknowledged that Finley yelled at her and blamed her for the trouble with their older son but denied he used violence or threats. She asserted that the door and heater had been in disrepair prior to April 4, and the blood was from a previous incident. She testified that she took advantage of these pre-existing conditions to strengthen her story to the police.

¶13    Furthermore, Debbie claimed she had never said that Finley wanted to crush her head. Alternatively, she asserted that if she had said something to that effect, it had been a lie. She claimed that she rarely wore shoes, and she had made a voluntary decision to leave her house wearing only pajamas. When the prosecutor asked Debbie about all of the inconsistent statements, Debbie responded that she would rather lie to the police than lie in court.

¶14    Finley was found guilty of partner or family member assault. The Lewis and Clark County Justice Court of record found Debbie's testimony to be unbelievable. It further found her to be a less than credible witness because her assertions were contradicted by all of the physical evidence and the 911 recording. Pursuant to § 46-17-311(1), MCA, Finley appealed to the District Court of Lewis and Clark County. He

5

argued that the State had presented insufficient evidence, and the prosecutor had engaged in misconduct.

¶15   On August 11, 2010, the District Court reversed the Justice Court.  As provided in § 3-10-115(1), MCA, the District Court did not conduct a new trial, but rather confined its review to the record and questions of law.  It concluded the evidence was insufficient to support Finley's conviction.  The District Court explained that Debbie was the only witness capable of establishing the element of reasonable apprehension of bodily injury. The District Court then reasoned that the State had failed to establish Debbie's reasonable apprehension of bodily injury because her testimony "was found by the trier of fact to be inherently incredible."  Because the District Court reversed the conviction based upon evidentiary insufficiency, it did not address Finley's allegation of prosecutorial misconduct.

¶16   On August 31, 2010, the State filed notice of appeal to this Court.  In response, Finley filed a motion to dismiss, arguing the State's appeal was unauthorized.  On January 4, 2011 this Court denied Finley's motion to dismiss and allowed the State's appeal to proceed.

## STANDARDS OF REVIEW

¶17   When a district court acts in an appellate capacity, we review to determine whether the district court reached the correct conclusions under the appropriate standards of review.  *Stanley v. Lemire*, 2006 MT 304, ¶ 26, 334 Mont. 489, 148 P.3d 643.

¶18   We review an appeal concerning evidentiary sufficiency to determine whether,

when viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the required elements of the offense beyond a reasonable doubt. *State v. Gunderson*, 2010 MT 166, ¶ 58, 357 Mont. 142, 237 P.3d 74.

¶19 Our review of constitutional questions is plenary. *State v. Brooks*, 2010 MT 226, ¶ 11, 358 Mont. 51, 243 P.3d 405.

DISCUSSION

¶20 *Whether the State's appeal is precluded.*

¶21 As a threshold matter, we address Finley's contention that the State's appeal is barred. Generally, the State may not appeal in criminal cases. Section 46-20-103(1), MCA. However, there are exceptions to this rule, including when a lower court's order or judgment substantively results in the dismissal of a case, or modifies or changes a verdict. Section 46-20-103(2), MCA. We conclude that the State's appeal is authorized.

¶22 First, Supreme Court precedent permits the State's appeal, without offending the Double Jeopardy Clause of the United States Constitution. In a bench trial, jeopardy attaches "when the judge begins to receive evidence." *U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 569, 97 S. Ct. 1349, 1354 (1977); *accord State v. Barron*, 2008 MT 69, ¶ 14, 342 Mont. 100, 179 P.3d 519. When a governmental appeal does not threaten a defendant with successive prosecutions, the Double Jeopardy Clause is not offended. *United States v. Difrancesco*, 449 U.S. 117, 132, 101 S. Ct. 426, 435 (1980). In *Smith v. Massachusetts*, 543 U.S. 462, 125 S. Ct. 1129 (2005), the Supreme Court explained:

Our cases have made a single exception to the principle that acquittal by

7

judge precludes reexamination of guilt no less than acquittal by jury: When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty.

*Smith*, 543 U.S. at 467, 125 S. Ct. at 1134. Such an appeal is permitted, because a defendant only faces restoration of a previously-entered guilty verdict, not a new trial. *Martin Linen Supply Co.*, 430 U.S. at 569, 97 S. Ct. at 1354. Article II, Section 25 of the Montana Constitution provides, in pertinent part, "[n]o person shall be again put in jeopardy for the same offense previously tried in any jurisdiction." Although this has been construed to provide greater protection against double jeopardy than its federal counterpart, *State v. Guillaume*, 1999 MT 29, ¶ 16, 293 Mont. 224, 975 P.2d 312, nothing in the case at hand compels departure from federal guidance. The State seeks to reinstate a guilty verdict set aside by the District Court, acting in an appellate capacity. This appeal fits squarely within the exception recognized in *Smith*.

¶23 Second, Finley's cite to *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141 (1978), potentially undermines his argument. The question in *Burks* was "whether a defendant may be *tried* a second time when a reviewing court has determined that in a prior trial the evidence was insufficient to sustain the verdict of guilty." *Burks*, 437 U.S. at 5, 98 S. Ct. at 2144 (emphasis added). The Supreme Court explained why remand for a new trial was impermissible:

By deciding that the Government had failed to come forward with sufficient proof of petitioner's capacity to be responsible for criminal acts, that court was clearly saying that Burks' criminal culpability had not been

8

established. If the District Court had so held in the first instance, as the reviewing court said it should have done, a judgment of acquittal would have been entered *and, of course, petitioner could not be retried for the same offense.*

*Burks*, 437 U.S. at 10-11, 98 S. Ct. at 2147 (emphasis added). Despite Finley's attempt to analogize this language to the case at hand, the *Burks* Court explained that its opinion did not address the government's ability to appeal from the intermediate appellate court:

> The United States has not cross-petitioned for certiorari on the question of whether the Court of Appeals was correct in holding that the Government had failed to meet its burden of proof with respect to the claim of insanity. Accordingly, that issue is not open for review here.

*Burks*, 437 U.S. at 5, 98 S. Ct. at 2144. Not only does this language foreclose Finley's reliance on *Burks*, but it suggests that the *Burks* Court would have entertained the merits, had the government appealed. Thus, if *Burks* adds anything to this case, it implicitly supports the State's ability to appeal.

¶24 Finally, *State v. Cool*, 174 Mont. 99, 568 P.2d 567 (1977), and *State v. Greenwalt*, 204 Mont. 196, 663 P.2d 1178 (1983), do not apply. Those cases concerned the State's ability to appeal from a trial court, after an acquittal for insufficient evidence. *Cool*, 174 Mont. at 100, 568 P.2d at 567; *Greenwalt*, 204 Mont. at 201-02, 663 P.2d at 1180-81. Double jeopardy precludes appellate review of the trial court in such cases, because the State's appeal essentially attempts to re-try the defendant. *Greenwalt*, 204 Mont. at 202, 663 P.2d at 1181. Here, the State's appeal does not subject Finley to retrial. Finley has already been found guilty at his original trial. On appeal he faces only potential reinstatement of the previously-entered guilty verdict. The Double Jeopardy concerns

9

present in *Greenwalt* and *Cool,* are absent here.

¶25 We conclude that the State is not precluded from appellate review when a district court, acting as an intermediate appellate court, sets aside a guilty verdict entered by a justice court of record. Should the State prevail, the tangible effect is reinstatement of the trier of fact's guilty verdict. Such circumstances do not subject defendants to impermissible retrial, further prosecution or double punishment for the same offense. Moreover, such an appeal comports with this Court's power and obligation to provide final appellate review of district court decisions when the district court has functioned as an intermediate appellate court. *State v. Seaman*, 2005 MT 307, ¶ 10, 329 Mont. 429, 124 P.3d 1137.

¶26 *Whether the State's evidence of reasonable apprehension of bodily injury was sufficient to support Finley's conviction for partner or family member assault.*

¶27 The State argues that the District Court proceeded under a mistaken belief that only Debbie's testimony could establish the element of reasonable apprehension of bodily injury. The State further asserts that this mistake led to a flawed review by the District Court. We agree.

¶28 Our proper scope of review in this case is whether the evidence presented in the Justice Court, when viewed in the light most favorable to the prosecution, could have allowed any rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt. *Seaman*, ¶ 10; *Gunderson*, ¶ 58. Appellate review by a district court is no broader than this Court's review of a lower court judgment. *Stanley*, ¶ 26. When

10

acting in an appellate capacity, the District Court cannot make findings of fact, but rather must confine review to the record and questions of law. *State v. Fender*, 2007 MT 268, ¶ 4, n. 1, 339 Mont. 395, 170 P.3d 971. Accordingly, to assess a district court's appellate conclusions, we must conduct an independent review of the trial court's record under the appropriate standard of review. *Seaman*, ¶ 10; *Stanley*, ¶ 26.

¶29 A person commits the offense of partner or family member assault if the person "purposely or knowingly causes reasonable apprehension of bodily injury in a partner or family member." Section 45-5-206(1)(c), MCA. The standard is objective, asking whether a reasonable person under similar circumstances would have reasonably apprehended bodily injury. *State v. Vukasin*, 2003 MT 230, ¶ 19, 317 Mont. 204, 75 P.3d 1284. The State need not establish fear of bodily injury, but rather must produce evidence that a reasonable person would have realized that bodily injury could result. *State v. McMahon*, 2003 MT 363, ¶ 22, 319 Mont. 77, 81 P.3d 508. Furthermore, the elements of a criminal offense do not require direct evidence and can be established by circumstantial evidence alone. *Vukasin*, ¶ 20.

¶30 Our review of Finley's trial reveals that the evidence presented by the prosecution could have allowed a rational trier of fact to conclude that the "reasonable apprehension of bodily injury" element was satisfied beyond a reasonable doubt. The 911 recording was introduced as evidence in the Justice Court trial. It captured more than just words. It clearly demonstrated Debbie's outright fear that Finley was going to harm her. She told the dispatcher that Finley had threatened to crush her head. Furthermore, she was scared

11

enough to flee her home, into a cold night with fresh snow on the ground, wearing only pajamas and socks. Not only did Debbie repeatedly express concern that Finley had followed her, but her fear was great enough that the dispatcher had to coax her out of hiding, once inside of the Town Pump. Additionally, the Justice Court heard from three police officers who testified to Debbie's distraught appearance. She told Reighard that if she had not left her house, she would probably be dead. Furthermore, Reighard confirmed the damage to the house and blood on the wall. These observations corroborated the story Debbie told on the 911 recording. Debbie's reluctance to remain in her house without police presence culminated in her decision to remove her entire family from the home that night. Finally, the Justice Court heard Debbie's trial testimony, which tended to conflict with almost all of the other evidence in the record.

¶31 As the trier of fact, the Justice Court had the ability to observe the witnesses and determine credibility. *State v. Pinkerton*, 270 Mont. 287, 293, 891 P.2d 532, 536 (1995). The Justice Court was free to evaluate Debbie's credibility on the witness stand separate from her statements made to the 911 operator and the investigating officers, shortly following the described events. Moreover, Debbie's earlier statements were corroborated by the 911 recording, and the officers' testimony. Based upon this record, the trier of fact could have found the required elements of partner or family member assault beyond a reasonable doubt.

¶32 Finley's cite to *State v. White Water*, 194 Mont. 85, 634 P.2d 636 (1981), is inapplicable to this case. In *White Water*, this Court stated, "a conviction supported only

12

by a prior inconsistent statement should not be allowed to stand." *White Water*, 195 Mont. at 89, 634 P.2d at 639. Finley's conviction was supported by far more: Debbie's 911 call, the physical evidence, the testimony of three police officers, as well as Debbie's prior inconsistent statements.

¶33 We conclude that the District Court erred when it reversed the guilty verdict entered by the Justice Court. However, the District Court made no ruling with regard to Finley's claim of prosecutorial misconduct. Accordingly, we reverse the judgment of the District Court and remand for resolution of the prosecutorial misconduct issue.


/S/ MIKE McGRATH


We concur:

/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ JIM RICE