FILED

June 30 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0490

DA 13-0490

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 187

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

RICHARD CURTIS PINGREE,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-12-141
Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Wade Zolynski, Chief Appellate Defender, Nicholas Domitrovich,
Assistant Appellate Defender, Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Tammy A. Hinderman
Assistant Attorney General, Helena, Montana

            William E. Fulbright, Ravalli County Attorney, Angela Wetzsteon,
Deputy County Attorney, Hamilton, Montana

Submitted on Briefs:  May 20, 2015

Decided:  June 30, 2015

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    A jury convicted Richard Curtis Pingree (Pingree) of Assault with a Weapon and Partner or Family Member Assault.  At the trial, Pingree's ex-wife, Caroline, did not testify and the District Court admitted a number of hearsay statements she made prior to trial.

¶2    The sole issue on appeal is whether Pingree's confrontation rights were violated when prior testimony from a civil order of protection hearing was read at his criminal trial.  We reverse.

## BACKGROUND

¶3    On September 11, 2012, the Ravalli County Attorney filed an information charging Pingree with felony Assault with a Weapon, in violation of § 45-5-213, MCA, and misdemeanor Partner or Family Member Assault, in violation of § 45-5-206, MCA. The State alleged that Pingree pointed a gun at his wife and fired it to the left of her head.

¶4    On October 5, 2012, Caroline Pingree, the alleged victim, sought an order of protection in Butte-Silver Bow County, where the parties' dissolution had been filed. Pingree was present at the hearing, although without counsel.[1]  He testified, but did not contest the order.  Pingree did not cross-examine Caroline.

¶5    Subsequently, Pingree pled not guilty to the criminal charges and the case went to a jury trial.  Pingree maintained that he did not intend to shoot at Caroline; rather, his finger slipped when loading the weapon.  Although the State subpoenaed Caroline, she

---

[1] The Office of the Public Defender represented Pingree in his criminal case.  His criminal defense attorney entered a notice of appearance on September 13, 2012.

2

was not served and did not appear at trial.[2]  Instead, the prosecutor introduced portions of a transcript from the civil order of protection hearing, at which Caroline testified to violence by Pingree.  The actual transcript was not entered as an exhibit; rather, it was read into evidence in question and answer form.

¶6     The District Court admitted the prior testimony over the objection of defense counsel.  The court held that Caroline's hearsay statements from the order of protection hearing were admissible under M. R. Evid. 804(b)(1)(B).  The District Court noted that Caroline's statements were made under oath and Pingree was advised of his right to cross-examine Caroline by the court, but declined the opportunity to do so.  The District Court reasoned that the confrontation clause requires only that the defendant have the opportunity to cross-examine, not that he actually do so, and that representation by counsel is not a requirement for admissibility.

¶7     While deliberating, the jury sent a request to the District Court asking to review the transcript of the order of protection hearing.  Judge Langton denied the request and provided a supplementary instruction that read, in part: "It would be improper for me to provide you a complete transcript of the Butte hearing as it would tend to give undue emphasis to that testimony.  If there is a specific point of topic from that hearing transcript that you request you may inform me of that and I will consider it."

---

[2] Although it was clear throughout the pretrial proceedings that Caroline had not been served with a subpoena, the record does not indicate that any efforts were made by the State to obtain an arrest warrant for her as a material witness and take her deposition pursuant to § 46-15-201(3), MCA.

¶8 On March 6, 2013, the jury found Pingree guilty of the charged offenses. Judge Langton sentenced him to the Department of Corrections for a period of fifteen years, with ten years suspended, on the Assault with a Weapon charge, and six months, with five months suspended, on the Partner or Family Member Assault charge (to run concurrently). Pingree now appeals.

## STANDARD OF REVIEW

¶9 This court reviews a district court's evidentiary decisions for abuse of discretion. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, 127 P.3d 458. We review a district court's conclusions of law and interpretations of the Constitution or the rules of evidence de novo. *Mizenko*, ¶ 8.

## DISCUSSION

¶10 *Issue: Whether Pingree's confrontation rights were violated when prior testimony from a civil order of protection hearing was read at his criminal trial.*

¶11 The State maintains that Pingree waived his M. R. Evid. 804(b)(1)(B) argument in the District Court. Additionally, the State asserts that Pingree waived any argument based on the Montana Constitution by failing to raise it below. Pingree asserts that he raised the M. R. Evid. 804 and confrontation issues, and the District Court considered them.

¶12 On the morning of the trial, the State indicated it intended to introduce Caroline's testimony from the order of protection hearing. Pingree objected on the basis of the "Sixth Amendment right to confront the witness, confrontation clause, *Crawford* [referring to *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354 (2004)], as well

4

as . . . the right to personally face your accuser." The District Court clearly considered the hearsay issue and ruled that the prior testimony was admissible under both *Crawford* and M. R. Evid. 804(b)(1)(B). Pingree's objection was clear and sufficient to preserve the issue on appeal.

¶13 The United States Constitution provides that criminal defendants "enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Similarly, the Montana Constitution provides that "in all criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face" Mont. Const. art. II, § 24. We have previously held that Montana's Confrontation Clause provides greater protection than the Sixth Amendment of the United States Constitution. *State v. Clark*, 1998 MT 221, ¶¶ 20-25, 290 Mont. 479, 964 P.2d 766. These protections prohibit the State's use of hearsay statements except in certain circumstances. *Mizenko*, ¶ 10.

¶14 "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M. R. Evid. 801(c); *State v. Sanchez*, 2008 MT 27, ¶ 17, 341 Mont. 240, 177 P.3d 444. Generally, hearsay is inadmissible unless specifically excluded by statute, the rules of evidence, or other court rules. M. R. Evid. 802; *Sanchez*, ¶ 17. M. R. Evid. 804 provides hearsay exceptions applicable when the declarant is unavailable.[3]

¶15 In a criminal case, former testimony given as a witness at another hearing, although hearsay, is admissible "if the party against whom the testimony is now offered

---

[3] Both parties stipulated to Caroline's unavailability for purposes of M. R. Evid. 804.

had an opportunity and similar motive to develop the testimony by direct, cross, and redirect examination." M. R. Evid. 804(b)(1)(B). In other words, before a prosecutor may introduce the former testimony of a now-unavailable witness, the defendant must have had, at the time testimony was given: (1) an opportunity to examine the declarant, and (2) a similar motive to develop the declarant's testimony. M. R. Evid. 804(b)(1)(B). The standard for admitting this evidence is whether the objecting party had the same motive to conduct the examination as he would at trial if the witness were available at that time. *State v. Homer*, 2014 MT 57, ¶ 9, 374 Mont. 157, 321 P.3d 77.

¶16 Cross-examination is essential to the adversary system. *Mizenko*, ¶ 13. Cross-examination "tests the witness's testimony in the most rigorous, demanding, and exacting" manner and has the potential to expose "flaws, inconsistencies, and insidious motives." *Mizenko*, ¶ 13. We agree with the State that Pingree's right to cross-examine Caroline was satisfied. The court presiding over the order of protection hearing advised Pingree of his right to cross-examine Caroline, but Pingree declined the opportunity. Although he was acting as his own attorney, he nonetheless had the opportunity to cross-examine Caroline and we conclude that M. R. Evid. 804(b)(1)(B)'s requirement that the individual have an opportunity to cross examine the declarant is satisfied.

¶17 However, the second prong of M. R. Evid. 804(b)(1)(B), requiring a similar motive, was not satisfied in this case. It is clear that the motives underlying the two cases were vastly different. An order of protection hearing is a civil proceeding. A protective order serves to prevent further conflict between the parties. Certainly, a respondent may face criminal consequences for violating an order of protection (*see* § 45-5-626, MCA),

but simply being named as respondent does not expose a respondent to criminal liability. Here, Pingree conceded the issue and agreed to the imposition of the protective order against him.

¶18 Conversely, a criminal case implicates a much higher risk for a defendant. The charges carry serious criminal penalties if a defendant is found guilty. A criminal conviction affects one's liberty in the most fundamental way and thus, a defendant is entitled to legal representation. Pingree risked maximum sentences of twenty years and $50,000 in fines for the Assault with a Weapon charge and one year and $1,000 in fines for the misdemeanor Partner or Family Member Assault charge. Sections 45-5-213(2)(a), -206(3)(a)(i), MCA. The consequences of a criminal prosecution provide a very different motivation for cross-examination.

¶19 Pingree did not have a similar motive for developing testimony via cross-examination of Caroline at both hearings. As discussed above, the punitive nature of criminal proceedings critically differs from a civil order of protection hearing. Notably, Pingree agreed to the imposition of the protective order against him, whereas he strongly maintained his innocence at the criminal trial. Therefore, we conclude that the District Court erred when it found that Caroline's statements satisfied the requirements of M. R. Evid. 804(b)(1)(B).

¶20 The State further asserts that the admission of Caroline's prior testimony was harmless. Trial errors are subject to harmless error review, using a "cumulative evidence" test to assess whether the district court's error was indeed harmless. *State v. Van Kirk,* 2001 MT 184, ¶¶ 40, 43, 306 Mont. 215, 32 P.3d 735. The State must

7

demonstrate that the jury was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, the tainted evidence would not have contributed to the conviction. *Van Kirk*, ¶ 47. The cumulative evidence test "focuses on the qualitative impact the inadmissible evidence may have on the fact-finder." *Sanchez*, ¶ 22. This inquiry is not simply whether other untainted evidence established the necessary elements of the crime. Instead, the harmless error analysis also requires us to ask whether the tainted evidence had a substantive impact on the jury's decision to convict.

¶21 The primary issue in the criminal trial was Pingree's intent, i.e., whether he intended to point and fire the gun or whether the gun discharged accidentally. The State claims that Caroline's testimony at the order of protection hearing was simply cumulative of other evidence admitted at the trial without objection, including the 911 call and the officers' testimony. We disagree.

¶22 Here, the introduction of Caroline's prior testimony calls into question the fundamental fairness of the proceeding. The State has failed to demonstrate that the facts admitted through Caroline's prior testimony did not have a substantive impact on the jury's verdict.

¶23 We acknowledge the many challenges presented in prosecuting intimate partner crime. Research suggests that the vast majority, between 80 to 85 percent, of abused women recant at some point. Tom Lininger, *Prosecuting Batterers After Crawford,* 91 Va. L. Rev. 747, 768 (2005). However, evidence-based approaches to domestic violence prosecution are available to pursue these crimes. For example, in *State v. Finley*, we

concluded that the victim's testimony is not necessary when there is additional evidence supporting the required elements beyond a reasonable doubt. *State v. Finley,* 2011 MT 89, ¶ 31, 360 Mont. 173, 252 P.3d 199. In *Finley,* we reaffirmed our prior holding that the elements of a criminal offense do not require direct evidence and can be established through circumstantial evidence alone. *Finley,* ¶ 29 (citations omitted). In that case, the victim placed a frantic call to 911, which was later admitted into evidence at the trial. *Finley*, ¶ 30. The 911 recording demonstrated the victim's fear and terror as the dispatcher tried to coax her out of the gas station where she was hiding. *Finley*, ¶ 5. Moreover, we found additional supporting evidence from the testimony of the responding police officers, who noted the victim's distraught demeanor and appearance and confirmed the damage to the house caused during the assault. *Finley*, ¶ 30.

¶24 Here, while not sufficient to establish harmless error, the State may have had sufficient evidence to pursue the prosecution without using Caroline's statements from the prior hearing. The State introduced the 20-minute 911 call, wherein Caroline stated: "My husband just fired a gun at me." The jury could hear Caroline crying on the call, clearly upset. The 911 dispatcher testified that Caroline was frightened and locked herself in the bathroom until officers arrived at the home. Caroline told the dispatcher that Pingree had instructed her to "tell us that he had shot into the floor, because he was going to be in big trouble."

¶25 Further, testimony from law enforcement provided other corroborative evidence. Deputy Colgan discussed Caroline's scared demeanor when officers arrived at the home. Detective Jessop testified to finding the gun at the bottom of the ravine with the gun's

9

chamber empty. According to Detective Jessop, the empty chamber suggests that someone removed the casings before throwing the gun to prevent matching the gun to the bullet. Trajectory analysis conducted by Deputy Cashell provided evidence of the bullet's entry into the couch at a close proximity and steep angle, consistent with Pingree standing over Caroline. Finally, Montana Crime Laboratory forensic scientist Lynette Lancon testified to the unlikelihood that either firearm[4] could have discharged accidentally and that the safety function on both guns was functioning correctly.

¶26 Moreover, Pingree's own testimony tended to cast him as not credible. Pingree testified that he told law enforcement officer Marshall Rose where he threw the gun. The State called Marshall Rose as a rebuttal witness and he denied that Pingree ever told him where to find the gun.

¶27 We are unable to conclude that the admission of Caroline's hearsay statements was harmless. The primary issue at Pingree's criminal trial was his intent; that is, whether he intended to shoot the gun at Caroline or whether the gun discharged accidentally. Caroline's hearsay statements, such as "he walked out and pointed a gun at me and fired . . . and then he laughed," directly contradicted Pingree's defense. Additionally, the hearsay statements included references to Pingree grabbing the phone out of Caroline's hand and throwing it out the front door, not allowing Caroline to visit her family in Butte, and past violent incidents between the couple ("It was not like a volatile fight or anything, like we'd been known to have in the past."). Moreover, the

---

[4] The prosecution was unable to prove conclusively which of two firearms present at the scene actually shot the bullet.

jury's request to examine the order of protection transcript while deliberating suggests that they placed considerable emphasis on the hearsay statements. While the dissent contends that the prior statement was not "more compelling or deserving of greater evidentiary weight" than the recording of the 911 call (citing *State v. McOmber*, 2007 MT 340, ¶ 35, 340 Mont. 262, 173 P.3d 690), it was a statement given under oath in a court of law and we cannot say that the testimony did not have a substantive impact on the jury. The record suggests that the statements had a qualitative effect on the jury's decision to convict Pingree and are thus not harmless.

¶28 In conclusion, Caroline's testimony at the order of protection hearing is hearsay. Montana Rule of Evidence 804 requires that before former testimony of a now unavailable witness may be admitted in a criminal case, the party against whom the testimony is offered must have had an opportunity and similar motive to probe the witness' testimony through cross examination. We conclude that under the facts of this case, Pingree did not have a similar motive to develop Caroline's testimony at the order of protection hearing. We further conclude that the State has failed to carry its burden to establish that the tainted evidence was harmless.

¶29 Reversed.

/S/ MIKE McGRATH

We Concur:

/S/ PATRICIA COTTER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT

Justice Beth Baker, dissenting.

¶30 I agree with the Court that Caroline's testimony from the civil order of protection hearing was inadmissible hearsay under M. R. Evid. 804(b)(1)(B), but I would find the error harmless and affirm Pingree's conviction.

¶31 While the Court properly describes the appropriate harmless error analysis, Opinion, ¶ 20, it does not engage in a meaningful discussion of the qualitative impact of the inadmissible evidence. As the Court acknowledges, there was strong evidence, admitted properly at trial, to counter Pingree's defense that the gun fired accidentally. Opinion, ¶¶ 24-26. Pingree's argument on appeal is that the inadmissible evidence nevertheless was critical because Caroline's testimony during the civil hearing was the only direct proof that Pingree intended to fire the gun, and that there was no independent evidence at trial to prove Pingree's mental state. He contends that in the recorded 9-1-1 call, Caroline said that Pingree shot a gun right next to her, which was not inconsistent with his defense, whereas, in the civil hearing, she testified that he pointed a gun at her and fired, and then he laughed.

¶32 Review of the record reveals that Caroline's testimony during the civil hearing was, in those respects material to the elements of the offenses with which Pingree was charged, substantively indistinguishable from what she reported during the recorded 9-1-1 call. When the State played the 9-1-1 recording at trial, the jury heard, from Caroline directly, the following conversation she had with the dispatcher:

> [Caroline]: My husband just fired a gun at me.
> [Dispatcher]: Your husband just what?
> [Caroline]: Fired a gun at me.

12

[Dispatcher]:  He fired a gun at you?
[Caroline]: Yeah.
[Audible crying.]
[Dispatcher]: Do you know why he fired at you?
[Caroline]:  . . . No. We've been having a little bit of problems going on. He just kind of woke up and he came and he told me he was just playing with me but he actually fired the gun right by me. . . . I was sittin' on the couch and he fired it like right next to me.

.    .    .

[Dispatcher]: Do you need an ambulance?
[Caroline]: No, he missed me.

.    .    .

[Dispatcher]: Has he ever done this before?
[Caroline]: Oh we had some problems several years ago.  Never to this extent, however.  I filed a restraining order on him and I moved away, and then we both got sober and stuff, and I moved back about a year and a half ago.

.    .    .

[Caroline]: I was sittin' on the couch and he just kinda came up and fired it right beside me.

.    .    .

[Caroline]: He just kind of put it up against me, shot it, and laughed.

.    .    .

[Caroline, after telling the dispatcher that Pingree is outside the bathroom door and may have heard her talking]: He asked me if I had really called the cops.  [The line goes dead, but dispatch calls her back.] . . . When he unplugged the phone he said, "I need you to tell everybody that you just thought I shot into the floor."

.    .    .

[Dispatcher]: So when he unplugged the phone he told you he just shot into the floor?
[Caroline]: He did, he knocked on the door, he said . . . , "you just have to tell everybody I shot a shot into the floor, okay?  I'm in a lot of trouble."

¶33    This evidence is not qualitatively different from Caroline's testimony during the civil hearing.  During that hearing, she said that Pingree "pointed" the gun, whereas she told the dispatcher that he fired it "at me," that he "fired it right beside me," and that he "kind of put it up against me."  This is a distinction without a substantive difference.  In both instances, she described Pingree laughing after he fired the gun.  And, as the Court

13

points out, there was independent corroborating evidence of the unlikelihood that the gun(s) could have been fired accidentally. Opinion, ¶ 25.

¶34 In determining whether trial error is harmless, "if the tainted evidence was admitted to prove an element of the offense, then the State must direct us to admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *State v. Derbyshire*, 2009 MT 27, ¶ 47, 349 Mont. 114, 201 P.3d 811. This Court's prior cases analyzing the qualitative impact of inadmissible evidence have found an evidentiary error to be harmless where there is untainted evidence of the same facts and, in comparison to the inadmissible evidence, the untainted evidence outweighs the impact of the evidence that should not have been admitted.

¶35 For example, in *Sanchez*, the trial court improperly admitted hearsay testimony from a neighbor that the deceased victim (Aleasha) had told her that, during an argument, Sanchez stated, "[M]e love you, [Aleasha]. Me not love you that much. You cross me, I kill you." *Sanchez*, ¶ 20. Although the evidence was powerful—and was evidence of words spoken by the victim that went directly to the disputed element of the defendant's mental state at the time of the shooting—we concluded that its admission was harmless error, stating:

> The jury heard from Aleasha's killer himself, that, after learning of Aleasha's infidelity, he made arrangements for the care of his children, he went to the store and purchased ammunition, he took the loaded gun to Aleasha's house, he waited for her to come outside, and he shot her after a brief argument.

14

*Sanchez*, ¶ 25.

¶36     In *State v. Stewart*, 2012 MT 317, 367 Mont. 503, 291 P.3d 1187, we agreed with the defendant that the trial court improperly admitted recordings of four telephone conversations between the victim and the defendant (her father) where the victim confronted him directly about his sexual abuse of her over a period of many years. During one such call, for example, the following exchange occurred:

> At the outset, A.S. reiterated that she was "tired of the sexual favors" because "it's my body, it's not your body." Stewart stated, "Okay. Are you tired of it?" and A.S. replied, "Yes." Stewart then stated, "Okay, it's done. It's that simple."

*Stewart*, ¶ 9.    The recorded calls were the only evidence tending to indicate the defendant's admission to the sexual abuse of his daughter; he testified at trial that he had no sexual contact with her.  *Stewart*, ¶ 18.  Comparing the inadmissible recorded phone calls with the untainted evidence proving Stewart's sexual abuse (which included the victim's trial testimony), we first pointed out that "this is not a case where the recordings filled in large holes and chronological gaps in the witnesses' testimony."  *Stewart*, ¶ 50. We concluded that although the recordings were "objectively reliable" evidence, "[q]ualitatively, nothing on the recordings is any more inflammatory or prejudicial than the other, admissible evidence at trial." *Stewart*, ¶ 50.

¶37     In *Mizenko*, we held that the trial court improperly allowed hearsay testimony from a sheriff's deputy and police dispatcher relating statements the domestic violence victim had made to them at the time of the defendant's assault of her.  As here, the victim did not appear at trial.  Because the recording of the victim's call to 9-1-1 was admitted

15

without objection and related the same facts, we concluded that the error was harmless. *Mizenko*, ¶ 26.

¶38 In contrast, we have found evidentiary error not to be harmless when the evidence improperly admitted is qualitatively different from the untainted evidence. A clear example of this is *State v. Gieser*, 2011 MT 2, 359 Mont. 95, 248 P.3d 300, a DUI case in which the state had not laid a proper foundation for the admission of evidence of the Horizontal Gaze Nystagmus (HGN) test or the defendant's breath test showing a blood alcohol concentration that exceeded the legal limit. Although untainted evidence established other indicia of intoxication, such as "the odor of alcohol, bloodshot and watery eyes, slurred speech, impaired coordination, and [the defendant's] difficulty finding his license[,]" we emphasized that the HGN and breath tests "have an appearance of precision and scientific reliability that is qualitatively different from the more subjective observations of the officer as to speech, eyes, coordination and odors." *Gieser*, ¶¶ 15-16.

¶39 Comparing these cases to the evidence at Pingree's trial, it is evident that Caroline's inadmissible hearsay testimony is not qualitatively different from her statements on the 9-1-1 recording. The facts recited by the Court in ¶¶ 24-26 demonstrate that other evidence properly admitted at trial proved the same facts. The question here isn't whether the statements are cumulative, but whether the content of the prior testimony is "more compelling or deserving of greater evidentiary weight," *McOmber*, ¶ 35, than Caroline's recorded conversation with the dispatcher. Both the tainted and the untainted evidence in this case are the victim's spoken words about

16

Pingree's conduct, and the evidence therefore is of similar quality. The evidence was used to both parties' advantage. Pingree used Caroline's prior testimony to call her credibility into question, pointing out in closing argument that she testified that Pingree grabbed the phone out of her hand in front of the responding law enforcement officers, but that none of the officers reported witnessing that. It is therefore speculative to say that the prior testimony had "substantive impact" on the jury's decision to convict. Opinion, ¶ 27. The State's case may have been even more compelling without it. In the final analysis, it cannot reasonably be argued that testimony read to the jury by a third person from a hearing that occurred weeks after the offense is more compelling or deserving of greater evidentiary weight than the recording of the victim's twenty-minute wait in her locked bathroom while officers responded to her call for emergency assistance.

¶40 I dissent.

/S/ BETH BAKER

Justice Jim Rice joins in the dissenting Opinion of Justice Baker.

/S/ JIM RICE