FILED

April 16 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0212

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 101

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

ZACHARIAH TORRES,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 09-258(A)
Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Brian K. Gallik; Goetz, Gallik & Baldwin, P.C.; Bozeman, Montana

            Sheryl Gordon McCloud, Law Offices of Sheryl Gordon McCloud, Seattle, Washington

      For Appellee:

            Timothy C. Fox, Montana Attorney General; Mardell Ployhar, Assistant Attorney General; Helena, Montana

            Ed Corrigan, Flathead County Attorney; Alison Howard, Travis Ahner, Deputy County Attorneys; Kalispell, Montana

Submitted on Briefs:   January 3, 2013
Decided:   April 16, 2013

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1    Zachariah Torres appeals a judgment of the Eleventh Judicial District Court after a Flathead County jury convicted him of aggravated assault, burglary, criminal endangerment, and assault on a peace officer, all felonies. We consider the following issues on appeal:

¶2    1. *Was the aggravated assault conviction supported by sufficient evidence?*

¶3    2. *Was the burglary conviction supported by sufficient evidence?*

¶4    3. *Should the Court exercise plain error review of Torres's argument that the convictions for aggravated assault and criminal endangerment violated statutory and constitutional double jeopardy protections?*

¶5    We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶6    On May 28, 2009, Zachariah Torres (Torres) and his wife, Grendy Torres, got into an argument at their Whitefish, Montana, home. Torres had discovered that Grendy was taking money from him and his family and sending it to her family in her home country of Costa Rica. At some point during the argument, Grendy left for the home of her coworker, Marina Sunell. Torres came to Marina's house looking for Grendy and knocked on Marina's door. Marina refused to open the door and called 911. When police arrived, Torres was not present and Grendy and Marina were reluctant to speak with the officers. After the police left, Torres returned and resumed ringing the doorbell and knocking on the door. Grendy followed Marina's instructions to go upstairs. Torres broke down the door, entered Marina's home, found Grendy, and left with her. Marina

again called 911 and reported that Torres had broken down her door and taken Grendy. When officers arrived, they found Marina "very upset." She told them Torres had grabbed Grendy "like a piece of rag" and dragged her from the house.

¶7 Torres and Grendy got into Torres's Subaru and began driving toward their residence. They continued to argue as Torres drove. During the trip, Grendy hit her head on the windshield, causing a small crack in the glass. Torres then punched the windshield, causing a second, larger break.

¶8 When Torres and Grendy arrived home, Grendy went to their upstairs bedroom. Torres retrieved a Glock .45 from his truck and followed Grendy upstairs, pointing the gun at his own head. As officers who had been dispatched in response to Marina's second 911 call approached, they heard a muffled gunshot from the direction of the Torres residence. Torres had opened the sliding glass door from their bedroom and fired a shot at the ground.

¶9 When officers arrived and surrounded the Torres property, Torres's younger brother came out of the house. He told the officers that Torres and Grendy were arguing, told them Torres had a Glock .45, and provided Torres's phone number. An officer called the number and identified himself. A male voice reportedly answered the phone, said "go fuck yourself," then hung up. The police could hear Torres and Grendy arguing in Spanish upstairs and heard Grendy yelling "no, no, don't," "stop," and "quit." One officer reported hearing Torres use the Spanish words for "kill" and "die." Officers then heard a male voice yell something to the effect of, "come in and get me you fucking

3

pussies, I'll blow your heads off," which they took to be a threat. Officer Stan Ottosen was standing on the top of a trailer in order to get a better view inside the home. Torres saw Officer Ottosen aiming a rifle in his direction and closed the sliding glass door. Torres then fired a second shot that hit the top of the sliding glass door, shattered the glass, and passed above the officers' heads.

¶10 Shortly thereafter, Grendy came out of the house and was taken into custody. Officers testified that she was frantic, crying and shaking, and left the house at a fast-paced walk or jog. Torres remained inside the house and fired a third shot into the bedroom floor. He then surrendered himself to police.

¶11 Officer Dorothy Browder took Grendy to the Flathead County Sheriff's Office, where the two spoke as they awaited the arrival of a detective. Grendy stated in English that Torres told her he wanted to show people he had a big gun. She also stated that she had been afraid she would die that night and wanted help returning to Costa Rica.

¶12 An officer also interviewed Torres at the station. Torres said that Grendy did not seem to want to leave Marina's house that day and acknowledged that she may have said so, but said that he grabbed her firmly by the arm and led her to the car. He stated that he had not harmed anyone and did not believe there was any reason for law enforcement to become involved in the situation. When asked about his use of the firearm, he explained that he fired the first shot because he wanted Grendy to understand the severity of the situation she had caused. He also grabbed Grendy and held her close because Officer Ottosen was pointing a rifle at the house and Torres was "unsure of the situation." He

4

stated that the second and third shots were accidental and not directed at the officers or at anyone else. He said he was not intending to hurt himself, but was trying to send a message to Grendy that this was a "serious situation."

¶13 On May 29, 2009, the following day, Grendy provided a full statement to Detective Kirby Adams and Deb Knaff, a victim's advocate. She stated that Torres had taken her from Marina's home against her will. She also stated that, while driving in the Subaru, Torres had been hitting her and pushed her head into the windshield, causing the first small crack. He then punched the windshield in frustration and anger, causing the larger break.

¶14 At Torres's January 2011 jury trial, however, Grendy provided a different account of those events. Grendy testified that she willingly departed Marina's house with Torres and that they were holding hands as they left. Marina similarly changed her account at trial. Asked whether Grendy left the house willingly or by force, she responded, "half and half." Grendy also changed her account of the events that occurred while driving in the Subaru. She testified that she had been "pushing [Torres], hitting him and pulling him" and that she "slipped from pulling and hit her head" on the windshield, since she was not wearing a seatbelt. She testified that Torres then punched the windshield because he "felt bad because I hit my head[.]" A copy of Torres's interview was entered into evidence and played for the jury.

¶15 On January 14, 2011, following five days of trial, the jury convicted Torres of four felonies: aggravated assault, burglary, criminal endangerment, and assault on a peace

5

officer.  On February 7, 2012, the District Court entered judgment and sentenced Torres to eight years in prison with five years suspended.  Torres appeals.

## STANDARD OF REVIEW

¶16     We review *de novo* whether sufficient evidence supports a conviction.  *State v. Trujillo*, 2008 MT 101, ¶ 8, 342 Mont. 319, 180 P.3d 1153 (citing *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511).  We view the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt."  *Trujillo*, ¶ 8 (citing *State v. Gladue*, 1999 MT 1, ¶ 34, 293 Mont. 1, 972 P.2d 827).  On direct appeal, "the appellant is limited to those issues that were properly preserved in the district court and to allegations that his or her sentence is illegal."  *State v. Rosling*, 2008 MT 62, ¶ 76, 342 Mont. 1, 180 P.3d 1102 (citations omitted).

## DISCUSSION

¶17     1. *Was the aggravated assault conviction supported by sufficient evidence?*

¶18     Torres mounts two challenges to the sufficiency of evidence supporting his conviction for aggravated assault.  First, he contends that the prosecution improperly combined separate incidents to accumulate proof of all the elements of aggravated assault.  Torres points out that neither the charging documents nor the State's case at trial clarified which specific events gave rise to the charge.  He divides his course of conduct on the evening of May 28, 2009, into three episodes: (1) the events at Marina's home; (2) the events in the Subaru; and (3) the events at the Torres home.  He contends that the

6

three episodes may not be viewed together to comprise the crime because aggravated assault is not a "continuous" offense. He argues that none of the three events considered in isolation yielded sufficient evidence at trial to prove the crime's elements. The State responds that "the continuous events that started when Torres broke down Marina's door and took Grendy away and ended when Grendy left her home" could be viewed together in support of the aggravated assault charge. Torres argues, secondly, that regardless of how the events are viewed, the State's case at trial rested on uncorroborated prior inconsistent statements that are legally insufficient to sustain his conviction.

¶19   Under § 45-5-202(1), MCA, "[a] person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another or purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death in another." The State argued in closing that the aggravated assault occurred when Torres employed a firearm while he was in the bedroom with Grendy:

> And with regard to aggravated assault – and that's with regard to his wife – you have to find that the Defendant intentionally or knowingly caused reasonable apprehension of serious bodily injury or death. And the first point here is the State would submit that when we're talking serious bodily injury or death, we're talking that possibility when we bring in a loaded handgun.

¶20   Torres argues that there was insufficient evidence that he used force or caused Grendy reasonable apprehension of serious bodily injury or death while in the bedroom. He notes that, according to Grendy's trial testimony, Torres "never hit her or threatened to do so in that room—instead, he was trying to kill himself." Thus, Torres contends that

7

the testimony was insufficient to prove "any actions or force by [Torres] placing Grendy in reasonable apprehension that she herself would suffer serious bodily injury or death[.]" We conclude that a reasonable juror could find sufficient evidence of aggravated assault based on evidence of what occurred at the Torres residence.

¶21 Officer Browder testified that Grendy willingly left the Torres residence to approach law enforcement and was crying and upset as she was transported to the police station. As Officer Browder kept Grendy company until a detective arrived, Grendy told the officer that she was very afraid she was going to die that night, asked for help in returning to Costa Rica, and expressed fear of having any further contact with Torres. When asked whether she would like to stay with Marina that night, Grendy expressed concern about what would happen if Torres came there. Though Officer Browder told Grendy that Torres would be in jail and could not come find her, Grendy decided to stay at a hotel that night.

¶22 The next day, Grendy told police that once she and Torres reached their house, Torres told her he would kill her and would also kill himself. Torres retrieved his Glock .45 and brought it upstairs to "show that he had a big gun." Grendy told the officers that Torres "wanted to kill" and that she was afraid she would die. When Torres broke down and started to cry, she "talk[ed] nice to him" and he let her leave. She stated that she ran from the house at that point. Torres acknowledged to police that he fired the gun intentionally to get Grendy's attention and that he held onto her while they were in the bedroom, though ostensibly because he was concerned about the police outside.

8

¶23 When viewed in the light most favorable to the prosecution, this evidence is sufficient to establish the elements of aggravated assault. Torres contends, however, that Grendy's prior inconsistent statements were not sufficiently corroborated by other evidence and that, without those statements, the evidence did not establish the elements of the offense. At trial, Grendy testified through an interpreter that she had lied to the police during those earlier statements. She stated that she placed the blame on Torres because she was afraid that she was being arrested and did not realize that criminal charges could be filed against Torres. She explained as follows:

> Well, because when I left the house that day there were so many police pointing to me that I thought that I was arrested. And they put a police car was that division when you are arrested [sic], and this is not my country, I don't have money, and the easiest way for me was to say lies and that he – and that he had problems, not me. But at the same time in my culture and my way of thinking nobody is setting him with charges, that's what I thought. And nothing that I said was true, and I thought that he was going to be in jail for three days and then that he was going to be out and that's it, we were going to be together.

At trial, she described herself as feeling tired and wanting to leave Marina's home when Torres first knocked on the door, and testified that she walked out of the house holding his hand. She also testified that she was free to leave the bedroom of the Torres home, but did not leave due to her concern for Torres's safety. She insisted that she had been afraid of the police that night, rather than afraid of Torres. Finally, she stated that she slept in a hotel on May 28 because she was embarrassed to return to the Torres residence after sending her husband to jail "for a bunch of stuff that was not true."

9

¶24     Torres relies on *State v. White Water*, 194 Mont. 85, 634 P.2d 636 (1981), and *State v. Giant*, 2001 MT 245, 307 Mont. 74, 27 P.3d 49, in arguing that insufficient evidence supports his conviction.  In *White Water*, we held that a conviction could not be based *solely* on an uncorroborated prior inconsistent statement.  194 Mont. at 89, 634 P.2d at 639.  The defendant was charged with sexual intercourse without consent based on the victim's unsworn statement to police.  *White Water*, 194 Mont. at 88, 634 P.2d at 638.  At trial, however, the victim contested ever stating that penetration had occurred and testified that the sheriff had twisted her words in his written documentation of their conversation.  *White Water*, 194 Mont. at 87-88, 634 P.2d at 637.  Since there was no other evidence to establish the element of penetration, the prior inconsistent statement the victim made to the sheriff was "the only evidence upon which a conviction could be based."  *White Water*, 194 Mont. at 87, 634 P.2d at 637.  Under such circumstances, we concluded that the evidence was legally insufficient to find guilt beyond a reasonable doubt and required dismissal of the case.  We discussed the rationale behind Fed. R. Evid. 801(d)(1)(A), which permits the admission of prior inconsistent statements:

> In many cases, the inconsistent statement is more likely to be true than the testimony of the witness at the trial because it was made nearer in time to the matter to which it relates and is less likely to be influenced by the controversy that gave rise to the litigation.  The trier of fact has the declarant before it and can observe his demeanor and the nature of his testimony as he denies or tries to explain away the inconsistency.  Hence, it is in as good a position to determine the truth or falsity of the prior statement as it is to determine the truth or falsity of the inconsistent testimony given in court.

10

*White Water*, 194 Mont. at 89, 634 P.2d at 638 (quoting Advisory Committee's Note to Fed. R. Evid. 801(d)(1)(A)).  As we explained in *White Water*, the Rule does not address the sufficiency of evidence to send a case to the jury, but merely its admissibility.  194 Mont. at 89, 634 P.2d at 639.  We held that the charges properly were dismissed because the prior inconsistent statement provided the *sole* evidence of one essential element of the offense.  *White Water*, 194 Mont. at 88-89, 634 P.2d at 638-39.

¶25   In *Giant*, we further clarified that sufficient corroboration of a prior inconsistent statement could not be found in other evidence that, by itself, could not constitute sufficient evidence of guilt.  *Giant*, ¶¶ 39-40.  A woman who had been assaulted in her home initially identified her husband as the assailant.  A warrant was issued for her husband's arrest and he fled from Montana for four months before turning himself in to law enforcement.  *Giant*, ¶¶ 4-5.  When the victim testified at trial that the assailant was her son and not her husband, the State attempted to corroborate her prior inconsistent statement through other evidence.  We concluded that the husband's flight was the only evidence presented to independently corroborate the victim's initial identification of him as the assailant.  Because "flight evidence cannot be the sole basis of guilt," *Giant*, ¶ 38, it could not serve to corroborate the prior statement.  "Holding that two forms of evidence, each unreliable in its own right, nonetheless, when taken together, are sufficient to prove guilt beyond a reasonable doubt, accords the sum of the evidence a characteristic trustworthiness that neither of its constituent parts possesses."  *Giant*, ¶ 39.

11

¶26 By contrast, when independent evidence corroborates a prior statement, the fact-finder may use that evidence in evaluating witness credibility and decide which statement is believable. *State v. Finley*, 2011 MT 89, ¶¶ 31-32, 360 Mont. 173, 252 P.3d 199. In that instance, the holding of *White Water* is inapplicable. In *Finley*, the defendant was charged with partner or family member assault based on his wife's statements to the police. She retracted those statements at trial, testifying that she disliked that her husband was drunk and had fabricated a story so that the police would remove him from the home. *Finley*, ¶ 12. We recognized that *White Water* did not apply because the prior statement was corroborated by other evidence of the assault—the victim's 911 call, physical evidence of assault within her home, and testimony of police officers regarding her appearance and demeanor immediately following the incident. *Finley*, ¶ 32.

¶27 Torres seems to suggest that the prior statements should not even be considered in reviewing the sufficiency of the evidence, but Montana law unquestionably permits such statements to be admitted as substantive evidence. *Giant*, ¶ 16; *White Water*, 194 Mont. at 88-89, 634 P.2d at 638. Prior inconsistent statements properly are considered in determining whether the evidence is sufficient to sustain the conviction; they just cannot be the sole evidence to prove an element of the offense. *White Water*, 194 Mont. at 88-89, 634 P.2d at 638-39. Nor may the necessary corroboration be supplied only by other evidence that is not sufficient to prove guilt. *Giant*, ¶ 39. In this case, for example, if Marina's prior inconsistent statement were the only evidence corroborating Grendy's

12

prior inconsistent statements, *Giant* might be more analogous. As long as each element of the offense finds support in some independent, reliable evidence of guilt besides the prior statement, however, corroboration will be sufficient.

¶28 During Torres's trial, the State played portions of the video recordings of both interviews of Grendy with the sound turned off so that the jury could observe her demeanor immediately following the incident. The State also played the video recording of Officer Browder's interview with Torres, which corroborated several portions of Grendy's prior statements. Torres admitted that Grendy did not want to leave Marina's house and that he grabbed her firmly by the arm and led her to the car. Torres's statements also established that he had physical contact with Grendy, holding her while in the bedroom with a powerful weapon in his hand. The evidence was undisputed that Torres intentionally fired shots from the bedroom. Torres reiterated several times in his statement to police that he shot the first bullet to make Grendy realize the "seriousness" of the situation "she had caused." The officers testified about their observations of Grendy's behavior and demeanor when she left the house, which indicated that she was very upset and afraid for her safety. And Grendy stayed in a hotel that night rather than returning home. Each of these pieces of evidence bears on an element of aggravated assault and corroborates Grendy's prior inconsistent statements. The jury had to consider the evidence *as a whole* in evaluating which version of events was accurate and whether Grendy's reasons for changing her account were believable.

13

¶29 This case is similar to *Finley*. Grendy retracted her previous statements and testified that she had lied in order to place blame on her husband, rather than on herself. The jury, however, considered her testimony in light of conflicting evidence that corroborated her previous version of events. The admission of Grendy's prior inconsistent statements as substantive evidence of Torres's guilt also served the purpose of Mont. R. Evid. 801(d)(1)(A)—the jury could observe Grendy's "demeanor and the nature of [her] testimony as [she] denie[d] or trie[d] to explain away the inconsistency" and was "in as good a position to determine the truth or falsity of the prior statement as it [was] to determine the truth or falsity of the inconsistent testimony given in court." *White Water*, 194 Mont. at 89, 634 P.2d at 638.

¶30 For the foregoing reasons, we conclude that there was sufficient evidence of aggravated assault. A reasonable jury could find that Torres used force when he fired the first gunshot in order to impress upon Grendy the seriousness of the situation. Grendy told the police that Torres's conduct caused her to be afraid that she would die that night. Her fear was reasonable under the circumstances: Torres had broken down Marina's door, allegedly forced Grendy to leave Marina's home, told her that he would kill her and himself, pushed Grendy's head into the windshield of the Subaru, and punched the windshield—all before retrieving his Glock .45 and firing a shot. We have clarified that when a weapon is employed under § 45-5-202(1), MCA, "[i]t is only necessary that the evidence show that the weapon was used in such a manner at the time and place and on that victim so that serious bodily injury was capable of being inflicted." *State v. George*,

203 Mont. 124, 129, 660 P.2d 97, 100 (1983) (quoting *State v. Klemann*, 194 Mont. 117, 122, 634 P.2d 632, 636 (1981)). Based on the evidence presented at trial, including Grendy's prior inconsistent statements, a reasonable jury could have found that standard was met when Torres fired the first gun shot.

¶31 Torres's argument that the State combined separate events to pull together enough evidence for an aggravated assault charge is unavailing. The elements of the offense were established by Torres's conduct inside the home. The events at Marina's house and in the Subaru certainly were not isolated incidents or removed from what occurred later, but contributed to the reasonableness of Grendy's apprehension or fear of serious bodily injury or death. They did not, however, result in the charging of aggravated assault as a "continuous offense." There was sufficient evidence to support the conviction.

¶32 2. *Was the burglary conviction supported by sufficient evidence?*

¶33 For the same reasons, we conclude that there was sufficient evidence for a reasonable jury to find the elements of burglary beyond a reasonable doubt. Under § 45-6-204, MCA, a person "commits the offense of burglary if the person knowingly enters or remains unlawfully in an occupied structure and: (a) the person has the purpose to commit an offense in the occupied structure; or (b) the person knowingly or purposely commits any other offense within that structure." The Information charged Torres with knowingly entering and remaining unlawfully in Marina's residence with the intent to commit "Unlawful Restraint and/or Assault" therein. A person commits unlawful restraint "if the person knowingly or purposely and without lawful authority restrains

15

another so as to interfere substantially with the other person's liberty." Section 45-5-301, MCA.

¶34    Torres argues that there was no evidence that he committed either assault or unlawful restraint, or that he intended to do so after breaking down the door to Marina's home. According to Torres's statement and Grendy's initial statement to the police, however, Grendy did not want to leave Marina's home. The following exchange was played for the jury:

> Adams: . . . would you say that she left with you willingly? Did she want to leave with you?
>
> Torres: No.
>
> Adams: She didn't?
>
> Torres: Uh-uh.
>
> Adams: She wanted to stay there. You made her leave.
>
> Torres: Yeah.
>
> Adams: And you think you have that right.
>
> Torres: Yes.
>
> Adams: Because you're her husband.
>
> Torres: Uh-huh.

This statement is not only direct evidence that Torres intended to commit unlawful restraint, but as discussed, also corroborates Grendy's prior statement that she was forced by Torres to leave. A reasonable juror could conclude on the basis of both statements that Torres "interfered substantially" with Grendy's liberty. Thus, the jury could

16

conclude that he knowingly entered and remained unlawfully in Marina's residence with the intent to commit unlawful restraint therein. Section 45-6-204, MCA.

¶35    3. *Should the Court exercise plain error review of Torres's argument that the convictions for aggravated assault and criminal endangerment violated statutory and constitutional double jeopardy protections?*

¶36    Under § 45-5-207(1), MCA, "[a] person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment." Torres argues that the elements of criminal endangerment are included in those of aggravated assault. Convicting him of both offenses, "at the same time and place, *against the same victim*, based on the same single discharge and the same intent," he argues, violates Montana's statutory double jeopardy clause protection as well as the double jeopardy clauses of the Montana and U.S. Constitutions (emphasis added).

¶37    Torres acknowledges that he did not raise the double jeopardy claim before the District Court. This Court ordinarily does not consider issues raised for the first time on appeal. *State v. Longfellow*, 2008 MT 343, ¶ 19, 346 Mont. 286, 194 P.3d 694. We may, however, discretionarily review a claimed error under the plain error doctrine if the appellant:

> (1) show[s] that the claimed error implicates a fundamental right and (2) 'firmly convince[s]' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process.

*State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737 (citing *State v. Taylor*, 2010 MT 94, ¶¶ 14-17, 356 Mont. 167, 231 P.3d 79 and *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208, 215 (1996)). The decision to invoke plain error review is a discretionary one that is used sparingly on a case-by-case basis. *State v. Hayden*, 2008 MT 274, ¶ 17, 345 Mont. 252, 190 P.3d 1091.

¶38 We have on numerous occasions declined to exercise plain error review of double jeopardy claims raised for the first time on appeal. *See State v. LeDeau*, 2009 MT 276, ¶ 18, 352 Mont. 140, 215 P.3d 672 (declining to review statute-based double jeopardy claim) (overruled in part on other grounds); *State v. Minez*, 2004 MT 115, ¶ 30, 321 Mont. 148, 89 P.3d 966 (same); *State v. Becker*, 2005 MT 75, ¶ 17, 326 Mont. 364, 110 P.3d 1 (explicitly declining to exercise plain error review of double jeopardy claim, but considering the issue instead in reviewing ineffective assistance of counsel claim). The State argues that Torres fails to demonstrate that the alleged error in this case is "plain" because "there are no Montana cases demonstrating that criminal endangerment is a lesser included offense of aggravated assault."

¶39 We conclude that Torres has not demonstrated plain error since the criminal endangerment charge, unlike the charge for aggravated assault, was based on Torres's conduct towards "others," rather than being limited to Grendy. The Information charged that Torres "knowingly engaged in conduct that creates a substantial risk of death or serious bodily injury to others, namely law enforcement officers, Grendy Torres, and/or adjacent neighbors . . . ." At trial, the prosecution sought to prove that Torres's use of the

Glock .45 endangered police and neighbors. In closing argument, the prosecution stated as follows:

> Lastly we have criminal endangerment, intentionally or knowingly creating a risk of serious bodily injury. Again, we're talking a handgun and we're talking bullets that go through glass and go through walls and go through people's yards and neighbors' yards where mailmen and kids and all sorts of people are, and we're talking whether or not he's creating a risk – either intentionally creating that risk or whether or not you should know when you start blasting towards houses that there's a risk.

¶40 Thus, whether or not the elements of aggravated assault include the elements of criminal endangerment, charging both crimes was not plain error under the facts of this case since different victims were involved.

¶41 The judgment of the District Court is affirmed.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS