DA 12-0132 and DA 12 0133

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 177

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

CHERYL LEE CRISWELL and EDWIN JAMES CRISWELL,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause Nos. DC-11-007(D) and
DC-11-010(D)
Honorable David M. Ortley, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender, Garrett R. Norcott, Assistant
          Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, C. Mark Fowler, Assistant
          Attorney General, Helena, Montana

          Ed Corrigan, Flathead County Attorney, Kenneth R. Park, Lori Adams,
          Deputy Flathead County Attorneys, Kalispell, Montana

Submitted on Briefs:  February 13, 2013

Decided:   July 2, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Cheryl Lee Criswell and Edwin James Criswell were convicted in the Eleventh Judicial District Court, Flathead County, of aggravated animal cruelty. The Criswells appeal, raising two issues: (1) whether the State presented sufficient evidence to convict and (2) whether the District Court abused its discretion in denying the Criswells' motion for a mistrial. We affirm as to both issues.

## PROCEDURAL BACKGROUND

¶2 On January 5, 2011, the State charged Cheryl and Edwin each with one count of aggravated cruelty to animals, a felony, in violation of § 45-8-217(2), MCA. In the Amended Information, the State alleged that on or about December 17 through December 25, 2010, the Criswells knowingly, and without justification, subjected ten or more animals (specifically, cats) to mistreatment or neglect by confining the animals in a cruel manner and/or by failing to provide the animals with food and water of sufficient quantity and quality to sustain the animals' normal health. The two cases were consolidated for trial. Cheryl and Edwin were represented by separate counsel.

¶3 Prior to trial, the Criswells filed a motion in limine to exclude evidence of other crimes, wrongs, or acts—in particular, "any allegations, charges or bad acts regarding mistreatment of animals at the hands of the Defendants"—pursuant to Rule 404(b) of the Montana Rules of Evidence. The Criswells were concerned specifically about evidence of their alleged mistreatment of several hundred cats in Idaho some years earlier. They opined that the State intended to use the events in Idaho for "improper propensity" purposes. *See State v. Stewart*, 2012 MT 317, ¶ 61, 367 Mont. 503, 291 P.3d 1187. In

response, the prosecution explained that it sought to use the Idaho evidence to show knowledge (i.e., that the Criswells knew that keeping their cats in the manner they did would harm or injure the cats) and absence of mistake (i.e., that the Criswells' alleged mistreatment of the cats in Montana was not inadvertent or accidental). The District Court held a hearing pursuant to *State v. Eighteenth Jud. Dist. Ct.*, 2010 MT 263, ¶ 49, 358 Mont. 325, 246 P.3d 415, and thereafter ruled that the State could offer the evidence for the two limited uses proffered by the prosecution.

¶4 A three-day jury trial was held in September 2011. In their opening statements, the Criswells told the jury that they had operated an "animal rescue" in Idaho for several years, handling "hundreds and hundreds and hundreds of cats." Eventually, however, the operation was shut down. The Criswells kept a number of their cats and relocated to northwest Montana. They initially moved around, living for awhile on Plum Creek land until the company asked them to leave, and thereafter staying at various campgrounds. Finally, they moved onto some land near Marion (west of Kalispell).

¶5 The Criswells acknowledged to the jury in their opening statements that their situation in December 2010 was desperate. "They got snowed in, they had no vehicle, they had no fuel, they had no food, they had no money, they got really desperate, things got really bad." At that point, they had 116 cats. The Criswells told the jury that they loved their cats and did not set out to harm them. Rather, "tragedy" struck: "lack of funds, lack of assistance, a huge cold snap and storm, turned into a perfect storm for disaster." The Criswells suggested that the evidence would show that their situation was not the result of criminal behavior, but was due to circumstances beyond their control.

¶6    Deputy Flathead County Attorneys Kenneth R. Park and Lori Adams presented the State's evidence, which is detailed below under Issue One. At the close of the State's case-in-chief, the Criswells moved to dismiss for insufficient evidence. The District Court heard arguments and denied the motions as to both defendants. The Criswells then presented testimony from five defense witnesses, including the Criswells themselves, and the prosecution thereafter presented two rebuttal witnesses.

¶7    In closing arguments, prosecutor Park referred to the Criswells' living situation as a "squatters camp" and characterized the Criswells as "professional freeloaders." Park also asserted that the Criswells had been "run out" of Idaho for abusing animals, and he implied that the Criswells had spent money on medical marijuana in lieu of providing food for their cats. The Criswells jointly moved for a mistrial based on these remarks. While finding that Park's remarks had been improper, the District Court also found that the remarks, considered within the context of the entire three-day trial, did not prejudice the Criswells' right to a fair trial. The court thus denied their motion.

¶8    The jury found Cheryl and Edwin guilty. The District Court deferred imposition of sentence on Cheryl for a period of six years, and committed Edwin (who had a prior felony conviction) to the Department of Corrections for two years, with those two years suspended. Cheryl's and Edwin's sentences were made subject to various conditions, including that they each complete 200 hours of community service and that they pay restitution jointly and severally in the amount of $14,684.47 to the Flathead County Animal Shelter. The District Court also limited Cheryl and Edwin to possessing only one companion animal each, provided the animal is spayed or neutered.

4

¶9    The Criswells now appeal, raising the same two issues. This Court has consolidated their appeals.

## DISCUSSION

¶10   *Issue One. Did the State present sufficient evidence to convict?*

### I. Standard of Review

¶11   Although the Criswells approach their sufficiency-of-the-evidence argument under two distinct theories, the governing legal standards are essentially the same.

¶12   On one hand, the Criswells contend that the State's evidence was insufficient to send the case to the jury and, thus, the District Court should have granted their mid-trial motion to dismiss. A motion to dismiss for insufficient evidence may be made at the close of the prosecution's evidence or at the close of all the evidence. Section 46-16-403, MCA. The motion should be granted only if, viewing the evidence in the light most favorable to the prosecution, there is not sufficient evidence upon which a rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *State v. Rosling*, 2008 MT 62, ¶ 35, 342 Mont. 1, 180 P.3d 1102. We review de novo a district court's conclusion as to whether sufficient evidence exists to convict. *State v. Swann*, 2007 MT 126, ¶ 19, 337 Mont. 326, 160 P.3d 511.

¶13   On the other hand, the Criswells contend that the State's evidence was insufficient to support the jury's ultimate finding of guilt and, thus, this Court should reverse their convictions. A claim of insufficiency of the evidence to support a verdict may be raised for the first time on appeal. *State v. Granby*, 283 Mont. 193, 198-99, 939 P.2d 1006, 1009 (1997). In assessing whether sufficient evidence supports a conviction, we view the

5

evidence in the light most favorable to the prosecution and determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *State v. Torres*, 2013 MT 101, ¶ 16, 369 Mont. 516, 299 P.3d 804.

## II. Analysis

¶14 The District Court instructed the jury that to convict a person of aggravated animal cruelty, the State had to prove beyond a reasonable doubt that

> 1. The Defendant inflicted cruelty to animals on a collection, kennel, or herd of ten or more animals; and
> 2. The Defendant acted knowingly.

*See* § 45-8-217(2), MCA. The District Court defined "cruelty to animals" as follows:

> Cruelty to animals means that without justification, a person knowingly subjects an animal to mistreatment or neglect by:
> 1. confining the animals in a cruel manner, or
> 2. failing to provide the animals in the person's custody with food and water of sufficient quantity and quality to sustain the animal's normal health.

*See* § 45-8-211(1)(b), (1)(c)(i), MCA. Finally, the District Court instructed the jurors that they had to determine Cheryl's guilt separately from Edwin's guilt and that, "in order to find a Defendant guilty, you must unanimously agree upon the commission of the same specific act constituting the crime within the period alleged."

¶15 On appeal, the Criswells challenge only the "without justification" element. They argue that the State failed to present sufficient evidence that the manner in which their cats were confined and nourished from December 17 to 25, 2010, was unjustified. The State, on the other hand, argues that the prosecution presented sufficient evidence from which a rational trier of fact could find that there was no justification for the cruelty the

6

Criswells inflicted. Given these arguments, we must review the trial record de novo, and in the light most favorable to the prosecution, to determine whether the State presented sufficient evidence on the "without justification" element.

¶16 According to the testimony of the State's witnesses, the Criswells relocated from Idaho to Montana in July 2010. At that time, they had three travel trailers and roughly 100 cats. The Criswells initially moved around, staying at various campgrounds, but in early November 2010 they set up a campsite near Marion, about a half mile off Pleasant Valley Road, in a clearing where the forest had been cut back for power lines. Their campsite included an old Winnebago motor home, a yellow camper, and a green camper.

¶17 Upon arriving in Montana, the Criswells contacted Kate Borton, who operated a nonprofit livestock rescue near Marion. The Criswells told Borton that they were a nonprofit cat rescue, and they asked her about sources of funding and places where they could set up a mobile home. Borton referred them to several local organizations that had assisted Borton when she first started her rescue operation.

¶18 The Criswells had further communications with Borton over the next few months. She provided them with cat food when Edwin indicated they were running out. They continued to ask her about sources of funding for their "already active" nonprofit rescue and about a place to put their mobile home. Borton sensed, however, that the Criswells were "not forthcoming" and, in fact, were "evasive" with her about their living situation.

¶19 The Criswells also had contact with the Flathead Spay and Neuter Task Force in the summer and fall of 2010. They represented to Task Force personnel that they were an animal rescue group and that they had no money. The Criswells made appointments to

7

have a number of their cats altered at the Task Force's spay-and-neuter clinics, which were held once a month. The Criswells were not always able to transport the cats to the Task Force facility, however, so Task Force volunteers drove out to pick the cats up. The Task Force also donated pet food to the Criswells. Notably, the Criswells always met Task Force personnel away from their campsite, and Task Force Director Mimi Beadles testified at trial (like Borton) that she felt the Criswells had been "evasive" about where they were living. She found it unusual that a "rescue group" would not have a website or a permanent facility where people could see the animals.

¶20 Task Force personnel observed medical issues in several of the Criswells' cats. For example, the two pregnant females that were brought into the July clinic had upper respiratory infections, and three of the ten males brought into the September clinic had issues relating to their eyes. Beadles spoke with Edwin in October and expressed concerns about the welfare of the Criswells' cats. Thereafter, the Criswells declined to have any of their cats spayed or neutered at the November clinic.

¶21 Sometime in the first half of December 2010, the Criswells contacted Beadles and admitted that they no longer could care for their cats. Beadles advised them to contact the Humane Society of the United States in Billings because that organization would be able to take in a large group of cats. Edwin expressly refused to follow through with this suggestion, however.

¶22 On December 16, Borton received a call from Edwin, who was at a gas station in Marion. He told her that his truck had broken down and that he and Cheryl were totally out of food, out of heating fuel, and out of money. He told Borton that "he was going to

walk back to the campsite where his wife was and his animals were, and he was done." Borton immediately grabbed some bags of food and drove to the gas station. She bought some diesel fuel for the Criswells' heater and helped Edwin get back to the campsite.

¶23 The next day, another individual who was camped near the Criswells gave them a ride to Borton's ranch. As Borton later testified, Cheryl and Edwin appeared "in very bad shape." They were "hungry, very thin, very dirty," and "obviously cold to the core." Borton noted that one of Cheryl's feet was frostbitten. The Criswells' demeanors "were very quiet, and they couldn't look you in the eye"—except when Borton asked about the cats, at which point the Criswells became "very very defensive."

¶24 Borton and a volunteer with the Spay and Neuter Task Force alerted Officer Paul Charbonneau of Flathead County Animal Control to the Criswells' situation—i.e., that they were living near Marion with over 100 cats and were "in dire straits." Charbonneau decided to conduct a welfare check that afternoon (Friday, December 17). He first drove to the Criswells' campsite. Due to the amount of snow on the ground, he had to park on Pleasant Valley Road and walk to the campsite. Upon arriving, he knocked on the Winnebago and the green and yellow camper trailers, but no one answered. He could see through the windows that there were cats in both trailers. Charbonneau noted that he did not have a cell phone signal at the campsite. Even when he got back to Pleasant Valley Road, the coverage was "spotty" at best.

¶25 Charbonneau proceeded to Borton's home after ascertaining that the Criswells were there. The Criswells admitted to him that they needed help and could not take care of themselves and the cats on their own. Yet, when Charbonneau suggested transporting

9

the cats to the Task Force facility, the Criswells indicated that they instead wanted to take the cats with them and find a shelter. Charbonneau tried to explain that they were not going to find a shelter able to take two people and a hundred cats. Borton offered to let the Criswells stay with her, but the Criswells elected to return to their campsite that evening. Charbonneau provided them with a bag of cat food.

¶26 Borton visited the Criswells' campsite the next day (December 18). With "a lot of hesitancy," they allowed her to enter the green and yellow trailers. Borton was surprised by the setup. Edwin had previously told her that the camper trailers were retrofitted with kennels for the cats, but Borton did not see any kennels. Rather, "there was a free-for-all. I walked in there . . . and I was jumped on by probably 15 or 20 cats. Had them on my head, my shoulders." The trailers were "very small" and "cramped," and there were "cats everywhere." Borton even heard cats moving around in the ceilings.

¶27 At trial, Borton characterized the trailers as "uninhabitable" for both people and animals. "There was feces everywhere, and the smell of ammonia from the urine was so strong it burnt my eyes, made me cough." In the yellow trailer, there was also a smell of diesel fuel that Borton found "so strong and vivid that I was afraid I was going to pass out." Borton noted that many of the cats in the two trailers were emaciated, dehydrated, and visibly sick. She saw no water pans in either trailer, nor did she see any cat food in the yellow trailer, but she did note some dry cat food on the floor in the green trailer.

¶28 Charbonneau arrived at the campsite as Borton was leaving. He brought fuel and water, plus additional pet food. Charbonneau advised the Criswells that he had started making arrangements to have the road into the campsite plowed and the trailers towed to

the Task Force facility. As events ultimately unfolded, however, the process of removing the trailers was delayed for several days due to a number of logistical issues—most significantly, mechanical problems with the road grader. In the meantime, the trailers and the cats remained under the Criswells' control.

¶29 Finally, on Wednesday, December 22, the road to the campsite was cleared and the trailers were towed (with the cats still inside) to the Task Force facility. Charbonneau testified that the Criswells did not exactly "relinquish" custody to him; rather, they "allowed" him to remove the trailers and the cats. The next day, he and Beadles made arrangements to transfer the cats into the clinic. Charbonneau entered the trailers to provide the cats with food and fresh water. At trial, he described the scene inside as a "free-for-all." On the morning of December 24, Charbonneau began removing the cats.

¶30 Charbonneau and Beadles testified at trial about the conditions they had observed when they entered the trailers on December 23 and December 25, respectively. Their descriptions were similar to what Borton had seen on December 18. The trailers were still highly unsanitary. "[E]verything" was "entirely covered" with feces and urine. The cats themselves were also covered, to some extent, in feces, and some also had "some type of fuel oil" on them. Even with breathing apparatus, Charbonneau found the smell "overwhelming." Due to the cold weather and the threat of predators (such as coyotes) in the vicinity of the Criswells' campsite, the cats had been confined continually in this "filth[y]" environment. Other than what Charbonneau had provided on the 23rd, there was no actual cat food, no bowls of water, and no clean litter pans.

¶31 Nearly all of the Criswells' 116 cats had a medical issue of some kind. Dr. Terrance R. Yunker, the veterinarian who examined the cats following their removal from the trailers, summarized their conditions at trial. Twenty-one cats had eye issues, such as conjunctivitis, ruptured eye, sunken eye, corneal scarring, and ocular discharge. Nine of these cats had to have their eyes removed, and Dr. Yunker noted that one of the cats had been in "very severe pain." Five cats had problems relating to their mouths, which required removal of their teeth. Twenty-five cats had respiratory conditions attributable to viral and bacterial causes. Forty-three cats suffered from dehydration. Three quarters of the cats were underweight, nine being severely emaciated. Fifty cats had ear mites. Two or three cats had skin lesions. An untold number had diarrhea.

¶32 Charbonneau, Beadles, and Dr. Yunker each testified that, in their professional opinions, the cats' medical conditions were attributable to the manner in which they had been confined in the Criswells' trailers. Dr. Yunker explained that "density" was one of the main problems. Cats, he explained, are not pack animals, and confining so many together in a small area not only put substantial stress on the animals, but also facilitated the transmission of diseases among them. The unsanitary conditions and lack of proper food and water only compounded the problem.

¶33 Eleven of the Criswells' cats were less than six months old; roughly eighty-five of them were between six and eighteen months old; and the remainder were over three years old. Three of the cats were pregnant and two were nursing. Dr. Yunker testified that he believed most of these cats were genetically related to each other. He opined that the Criswells had rescued no more than half a dozen cats and had bred the rest.

¶34     Dr. Yunker estimated that the cats' medical conditions had been ongoing for several months before their rescue. Likewise, Charbonneau and Beadles indicated that the unsanitary conditions inside the trailers existed before the trailers were towed from the Criswells' campsite. In this regard, Beadles testified that it required 20 volunteer hours per day to maintain sanitary living conditions for the Criswells' cats following their transfer to the Task Force facility. Moreover, the cats consumed 25 pounds of cat food per day and 210 pounds of cat litter per week—at a weekly cost of $175, not to mention overhead expenses such as electricity. The Criswells had not been equipped to provide this minimal level of care.

¶35     Borton was questioned (on cross-examination and again on redirect examination) on the issue of funding. While acknowledging that it is not always easy for a nonprofit to obtain funds, she emphasized that a rescue organization must arrange proper funding *before* taking in the animals. She opined that "you don't get the animal and go, oh, well, maybe in six months somebody will donate me a bag of dog food. You've got to have something in place, you've got to have a facility for them to live, you've got to have food, water, and shelter appropriate to that animal, you've got to have light, and veterinary care in place, absolutely." The Criswells had not made such preparations.

¶36     The State's final witness was Dr. Jeff Rosenthal, a veterinarian and the Executive Director of the Idaho Humane Society. The prosecution called Dr. Rosenthal to discuss events involving the Criswells several years earlier.[1] He testified that in October 2005,

---

[1] The District Court instructed the jury that this testimony was to be considered only for purposes of knowledge and absence of mistake, and not character or propensity.

he conducted an inspection of Voice of the Animals, a cat "rescue" that the Criswells were running on a fairly remote property in a rural area of northern Idaho. The operation consisted of eight trailers housing hundreds of cats. The trailers were "filled with feces and urine" and were "in poor repair." Many of the cats showed signs of medical issues.

¶37    Dr. Rosenthal informed the Criswells during the October 2005 inspection that the conditions inside their trailers were unsanitary and were leading to illnesses among the cats. He told them that the animals needed to be segregated and that the Criswells should "divest themselves of as many of the cats as soon as they could, because the facility was unsuitable for the use it was being used for." Nevertheless, when Dr. Rosenthal made an unannounced visit to the property eleven months later (in September 2006), conditions were even worse. There was "significantly more" fecal contamination and urine. While food and water were present, "much of the food was scattered among the feces, and much of the water wasn't clean water." With hundreds of cats confined together, Dr. Rosenthal testified that there would have been fights and competition for food, with the weak and sick cats not getting the nutrition they needed. The cats suffered "a great deal of stress" in this situation. Dr. Rosenthal diagnosed various medical problems, including upper respiratory disease, conjunctivitis, flea and ear mite infestation, and emaciation due to malnutrition or illness. He attributed these problems to the extreme number of cats, the extreme density of the cats, and the lack of proper food, water, and sanitation. In the end, 264 of the 400-plus cats removed from the trailers had to be euthanized.

¶38    Given the foregoing testimony from the State's witnesses, we disagree with the Criswells' contention that the State failed to present sufficient evidence that they acted

without justification. Again, viewing the evidence in the light most favorable to the prosecution, the Criswells knew of the problems that can (and ultimately did) result from attempting to house and care for a large number of cats without adequate funding and facilities. The Criswells knew that confining multiple cats together in cramped quarters, and failing to provide them with proper food, water, and sanitation, stresses the cats and leads to medical issues. Yet, despite this knowledge, and despite their lack of money and food, the Criswells chose to confine over 100 cats together in two camper trailers, which were wholly inadequate to house this number of cats. Moreover, they chose to situate themselves and their cats in a relatively remote location, a half mile off the county road, where there was no cell phone coverage and where vehicle access during winter months would be problematic. The unsanitary conditions of the trailers and the illnesses of the cats inside existed for weeks, perhaps even months, before the cats were rescued. Throughout this period, resources were available to help the Criswells and their cats, yet the Criswells maintained an intransigent attitude and persisted in concealing the true conditions of their facilities and their cats from those who could provide assistance. This included Borton, Beadles, and Charbonneau—who, upon learning of the severity of the Criswells' situation, promptly rallied members of the community to effect a rescue.

¶39 Focusing on the specific dates charged in the Amended Information (December 17 to December 25), the Criswells contend that natural forces beyond their control—severe winter weather—dictated the manner in which the cats were confined and nourished from the 17th to the 21st, and that the cats were in the care and possession of the County from the 22nd to the 25th. Thus, they maintain that they could not have done anything to

15

improve the cats' situation during this period. This argument, however, misses the mark. The issue before the jury was whether the Criswells, without justification, knowingly subjected animals to mistreatment or neglect. *See* ¶ 14, *supra*. Based on the testimony, a rational trier of fact could find: that the Criswells decided to keep a large number of cats, knowing that their finances and facilities were insufficient to sustain the animals; that the lack of proper food, water, sanitation, and medical care existed for several weeks, if not months; that the Criswells decided not to obtain meaningful assistance until December 16, at which point access to the campsite was hindered by snow; that the Criswells had no justification for their decisions to keep an unmanageable number of cats and to delay in obtaining assistance; and that the Criswells thereby subjected their animals to mistreatment or neglect, in the form of cruel confinement and/or inadequate nourishment, from December 17 to December 25.

¶40　For these reasons, we hold that the State presented sufficient evidence to support a "without justification" finding.

¶41　***Issue Two. Did the District Court abuse its discretion in denying the Criswells' motion for a mistrial?***

### I. Standard of Review

¶42　We review a trial court's grant or denial of a motion for a mistrial to determine whether the court abused its discretion. *State v. Gladue*, 1999 MT 1, ¶ 11, 293 Mont. 1, 972 P.2d 827. A court abuses its discretion when it acts arbitrarily without employing conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *State v. Bollman*, 2012 MT 49, ¶ 23, 364 Mont. 265, 272 P.3d 650. The burden to

16

demonstrate an abuse of discretion is on the party seeking reversal of an unfavorable ruling. *State v. Price*, 2006 MT 79, ¶ 17, 331 Mont. 502, 134 P.3d 45.

## II. Background and the District Court's Decision

¶43 As noted, the Criswells jointly moved for a mistrial based on remarks prosecutor Park made during closing arguments. The challenged remarks occurred in two portions of the prosecutor's argument. First, in discussing whether the animals were confined in a cruel manner and whether the confinement was justified, Park stated:

> Now, let's talk about the confining portion of this. You heard from Dr. Yunker, Dr. Rosenthal, and Paul Charbonneau about the way these cats were confined. You've seen the pictures. Any more than one or two cats in those confined trailers is cruel, especially if they are subjected to the diseases and viral infections that the confinement caused. What kind of animal deserves to be locked in its own filth for weeks to months at a time?
>
> The Defendants want you to believe that this was caused by a freak snowstorm that locked them in their squatters camp where they were trespassing. Well, it is northwest Montana, it snows, it started snowing a couple months before this happened.

Further along in his argument, referring to the Criswells' testimony that they had solicited and relied on donations to support their Idaho and Montana operations, Park asserted:

> The beauty of being a juror in this country is that you get to go back to that room and ask yourself what really makes sense in this case, what really happened here. The scenario that fits this is easy. The Criswells were run out of Idaho because they were claiming to be a no-kill cat rescue, yet their actions killed more cats than a kill shelter and they refused to listen to anybody there. The truth of the matter is that the Criswells, Edwin and Cheryl Criswell, are freeloaders, professional freeloaders at that. They even stepped up here and questioned Paul Charbonneau as to why he didn't bring them cleaning supplies courtesy of the taxpayers of this county. The Criswells have taken freeloading to a whole new level. How many times in the past words [sic] have we heard the word "donate" or "give"? The Criswells have figured out that if they have a 501(c)(3) nonprofit animal rescue they can ask everyone else to give them stuff and they don't have to go do the one thing that they need to do to survive, and that is work.

Dr. Ladanye even testified that Edwin has a medical marijuana card, yet he can cut wood and do yard work. We can afford marijuana but we can't afford cat food.

¶44 The Criswells did not contemporaneously object to the "squatters camp," "run out of Idaho," and "freeloaders" remarks. Edwin did object, however, to the "marijuana" references. He argued that the prosecutor was "asking the jury to make a decision based on the nature of what [Edwin] is doing, not the facts of the charge." The District Court sustained the objection and reiterated to the jurors that they were to disregard anything that was not in evidence and were to rely on their "own individual and collective recollection of what the evidence is in this case and not the argument of counsel."

¶45 In his closing argument, Edwin's counsel identified some of Park's "inflammatory comments" and attempted to refute them. Then, after the jury had retired to deliberate, the Criswells made their motion for a mistrial. They argued that the prosecutor had tainted the jury by offering inadmissible character evidence and improper personal opinions regarding their credibility and culpability. They posited that the District Court's curative instruction was insufficient to remedy the taint. In response, Park argued that the Criswells themselves had opened the door to his remarks and that their conduct met the definitions of "freeloader" and "squatter." He maintained that his remarks had not been intended to inflame the jury or to comment on the Criswells' characters.

¶46 The District Court recessed to research whether the challenged remarks warranted a mistrial. The court applied this Court's two-step analysis for determining whether improper comments have prejudiced a defendant's right to a fair and impartial trial. The first step is to determine whether the prosecutor made improper comments. If improper

18

comments were made, the second step is to assess whether those comments prejudiced the defendant's right to a fair and impartial trial. *State v. Lindberg*, 2008 MT 389, ¶ 25, 347 Mont. 76, 196 P.3d 1252; *Gladue*, ¶¶ 11-12. Prejudice resulting from improper comments is not presumed; the burden is on the defendant to demonstrate that the prosecutor's improper comments prejudiced his or her right to a fair and impartial trial. *Lindberg*, ¶ 25; *Gladue*, ¶ 27. In determining whether prejudice resulted, the improper comments must be viewed in the context of the case in its entirety. *Lindberg*, ¶ 25.

¶47 Applying this test, the District Court first found that Park's remarks were improper in that they were inflammatory, unprofessional, or without any basis in the record. The District Court then determined, however, that the Criswells had not met their burden of demonstrating that the remarks, viewed in the context of the entire three-day trial, had prejudiced their right to a fair and impartial trial. The court noted that Edwin himself had been "loose with his speech" and often "spoke in a vernacular" during his testimony.

### III. Analysis

¶48 As noted, we review for abuse of discretion a trial court's grant or denial of a motion for a mistrial. *Gladue*, ¶ 11. We apply this deferential standard because the trial judge is in the best position to gauge the effect that the event at issue—whether the introduction of inadmissible evidence, the presentation of questionable testimony, or the making of improper comments during closing argument—will have on the jury. *State v. Seaman*, 236 Mont. 466, 475-76, 771 P.2d 950, 956 (1989); *State v. Long*, 2005 MT 130, ¶ 27, 327 Mont. 238, 113 P.3d 290; *State v. Dubois*, 2006 MT 89, ¶ 61, 332 Mont. 44, 134 P.3d 82. Here, we conclude that the District Court did not abuse its discretion.

¶49 As to the first prong of the analysis, we agree with the District Court that Park's remarks were improper.[2] There was no evidence in the record supporting the assertion that the Criswells had been "run out" of Idaho, and although there was evidence that Edwin had a medical marijuana card, there was no evidence that Edwin had actually purchased marijuana in lieu of providing cat food. It is improper for a prosecutor to comment on evidence not of record during closing argument. *Gladue*, ¶ 14; *State v. Daniels*, 2003 MT 247, ¶ 26, 317 Mont. 331, 77 P.3d 224. Furthermore, whether the Criswells met the definitions of "squatters" and "freeloaders" is beside the point. The Criswells' financial situation was a legitimate issue to argue in relation to the "without justification" element, but labeling them as "squatters" and "freeloaders"—which are generally understood to be disparaging terms—was not necessary to achieve that end. We have "disapprove[d] of a prosecuting attorney using any derogatory epithets to refer to any defendant during the trial," *State v. White*, 151 Mont. 151, 161, 440 P.2d 269, 275 (1968); *see also e.g. State v. Kingman*, 2011 MT 269, ¶ 58, 362 Mont. 330, 264 P.3d 1104, and we reaffirm that view here. A defendant must be tried for what he did, not for who he is. *U.S. v. Foskey*, 636 F.2d 517, 523 (D.C. Cir. 1980); M. R. Evid. 404.

¶50 That said, we are not persuaded by the Criswells' argument under the "prejudice" prong of the analysis. They opine that because the Flathead Valley community took "a special interest" in the case, the jury was "already feeling pressure from the audience," and Park's remarks "served only to bias the jury's feelings heading into deliberations."

---

[2] In its answer brief on appeal, the State notes that it "does not dispute the district court's finding that the comments were 'unprofessional, unnecessary, and inflammatory.'"

The trial judge considered this possibility and rejected it, and we do not believe the judge, in so doing, failed to employ conscientious judgment or exceeded the bounds of reason. First, after Edwin objected to Park's marijuana references, the judge reminded the jurors that they were to rely on their own memories of the evidence and were to disregard any assertions by counsel of matters not in evidence. "The potential prejudicial effect of improper arguments may be cured when the jury has been admonished not to regard those statements as evidence." *Gladue*, ¶ 31. Second, the judge gave careful consideration to the Criswells' motion, recessing for over an hour to study the relevant legal standards under this Court's cases. Third, in denying the motion, the judge noted that the jury had already been exposed to "loose" language and "vernacular" during Edwin's testimony. While this does not excuse Park's improper remarks in closing, it does tend to mitigate their prejudicial effect. Fourth, in asking us to find that Park's remarks served "only" to bias the jury against them, the Criswells ignore the possibility that the remarks instead served to impugn Park's credibility. After three days of testimony, the jurors already were well aware of the Criswells' living situation and the fact that they had relied on donations. Rather than being biased against the Criswells by Park's remarks, it is more plausible that the jurors saw those remarks for what they were: unprofessional and unnecessary disparagements of the defendants having no bearing on the question of guilt.

¶51     "Because the trial court is in the best position to observe the jurors and determine the effect of questionable statements made in closing argument, it is given a latitude of discretion in its rulings on motions for mistrial based on such statements." *Dubois*, ¶ 61. Here, the trial judge determined that the prosecutor's remarks—considered in the context

21

of the entire trial—were not so egregious as to render the jurors incapable of judging the evidence fairly. The Criswells have not shown an abuse of discretion in this ruling.

## CONCLUSION

¶52 The State presented sufficient evidence upon which a rational trier of fact could find beyond a reasonable doubt that the Criswells, without justification, knowingly subjected their animals to mistreatment or neglect from December 17 to December 25, 2010. The District Court did not abuse its discretion in denying the Criswells' motion for a mistrial.

¶53 Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ BRIAN MORRIS

Chief Justice Mike McGrath concurs.

¶54 While I concur with the decision of the Court, I write separately only to emphasize the serious nature of what I believe to be the prosecutor's misconduct. I concur that, given the overwhelming evidence in this case, the comments did not prejudice the Criswells' rights to a fair and impartial trial. Jurors, in my experience, tend to come to court grounded in common sense and good judgment and can generally overlook the

attorneys' peculiarities or illogical missteps. Considering the District Court's careful review of the prosecutor's comments and the instructions that the court gave to the jury, there is little question that the proceedings were conducted fairly. The fact that we affirm the Criswells' convictions, however, does not mean that we condone or tolerate the prosecutor's improper remarks.

¶55 While not designed to be used as criteria for judicial evaluation of misconduct, the ABA Standards for Criminal Justice do provide an appropriate benchmark for professional conduct. Regarding the prosecution, Standard 3-5.8(c) provides that "[t]he prosecutor should not make arguments calculated to appeal to the prejudices of the jury." ABA Standards for Criminal Justice, Prosecution Function and Defense Function, Standard 3-5.8(c), 106 (3d ed. 1993). The comments further explain:

> Unfortunately, some prosecutors have permitted an excess of zeal for conviction or a fancy for exaggerated rhetoric to carry them beyond the permissible limits of argument. [S*ee e.g. Berger v. United States*, 295 U.S. 78 (1935).] Of course, a prosecutor must be free to present arguments with logical force and vigor. Nonetheless, as the Supreme Court has remarked, "while he may strike hard blows, he is not at liberty to strike foul ones." [*Berger*, 295 U.S. at 88.]

.   .   .

> Remarks calculated to evoke bias or prejudice should never be made in a court by anyone, especially the prosecutor. Where the jury's predisposition against some particular segment of society is exploited to stigmatize the accused or the accused's witnesses, such argument clearly trespasses the bounds of reasonable inference or fair comment on the evidence. . . .

ABA Standards at 107-08.

¶56    The United States Supreme Court recently rejected a petition for certiorari in a case where the prosecutor made similar appeals to prejudices.[1]  Although the Court denied the petition, Justice Sotomayor issued a statement that was joined by Justice Breyer to ensure that the Court's denial of the petition did not signal tolerance of the prosecutor's improper remarks.  In the statement, Justice Sotomayor quoted Judge Frank of the Second Circuit Court of Appeals:  "If government counsel in a criminal suit is allowed to inflame the jurors by irrelevantly arousing their deepest prejudices, the jury may become in his hands a lethal weapon directed against defendants who may be innocent.  He should not be permitted to summon that thirteenth juror, prejudice."  *Calhoun*, 133 S. Ct. at 1137 (quoting *United States v. Antonelli Fireworks Co.*, 155 F.2d 631, 659 (2d Cir. 1946) (J. Frank dissenting) (footnote omitted)).  Justice Sotomayor, a former prosecutor, further remarked, "[s]uch conduct diminishes the dignity of our criminal justice system and undermines respect for the rule of law.  We expect the Government to seek justice, not to fan the flames of fear and prejudice."  *Calhoun*, 133 S. Ct. at 1138.

¶57    In his explanation to the District Court, the prosecutor maintained that his remarks had not been intended to inflame the jury or to comment on the Criswells' characters.  *See* Opinion, ¶ 45.  Personally, I find that hard to believe.  If not intended to inflame the jury or comment on the Criswells' characters, then what were they intended to do?  A

---

[1]  While questioning the defendant, who is African-American, the prosecutor asked, "You've got African-Americans, you've got Hispanics, you've got a bag full of money.  Does that tell you–a light bulb doesn't go off in your head and say, This is a drug deal?"  *Calhoun v. United States*, 133 S. Ct. 1136, 1136 (2013).

prosecutor is an officer of the court. Prosecutors must strive to promote justice and the rule of law. By making these improper comments to the jury, the prosecutor undermined the respect for the criminal justice system. Although the prosecutor's comments were not grounds for a mistrial in this case, it must be emphasized that this type of conduct is not to be tolerated.

/S/ MIKE McGRATH